CV11 - 5108

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ORIGINAL

GEORGE MAKHOUL individually, and as Successor in interest to M.E.S., INC.

Plaintiff,

v.

WATT, TIEDER, HOFFAR & FITZGERALD, LLP
MARK SGARLATA, an individual,
CHRISTOPHER BRASCO, an individual,
VIVIAN KATSANTONIS, an individual, and
CHRISTOPHER ANZIDEI, an individual.

Defendants.

Case No.:

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 20 2011 ★
BROOKLYN OFFICE

COMPLAINT

GLEESON, J.
GO, M.J.

JURY TRIAL DEMANDED

Plaintiffs, George Makhoul individually and as successor in interest to M.E.S., Inc. (hereinafter "MES"), complaining of the defendants, allege as follows:

## JURISDICTION

1. This court has jurisdiction over this matter under 28 U.S.C §1332 in that complete diversity of citizenship exists between the plaintiffs and defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

## VENUE

2. Venue is properly laid in the Eastern District of New York as delineated in 28 U.S.C. §1391(a)(2) as the events giving rise to this complaint originated in the Eastern District of New York.

RECEIVED
OCT 20 2011
PRO SE OFFICE

## PARTIES

3. M.E.S., Inc. ("MES") was a New York corporation where George Makhoul, at all times of MES' existence, was its sole officer, director, and shareholder and is its sole successor in interest.

4. George Makhoul, a resident of the State of New Jersey, has executed in his individual capacity indemnity agreements in favor of Safeco Insurance Company of America for its principal MES.

5. Upon information and belief, defendant Watt, Tieder, Hoffar & Fitzgerald, LLP ("WTHF") is a Virginia professional partnership practicing law and having its principal place of business at 8405 Greensboro Drive, Suite 100, McLean, Virginia 22102.

6. Upon information and belief, defendant Mark Sgarlata Esq. resides in the State of Virginia, is currently and was at all times referred to hereafter an attorney and a partner with the law firm WTHF with his principle office located at 8405 Greensboro Drive, Suite 100, McLean, Virginia 22102.

7. Upon information and belief, defendant Christopher Brasco Esq. resides in the State of Virginia, is currently and was at all times referred to hereafter an attorney and a partner with the law firm WTHF with his principle office located at 8405 Greensboro Drive, Suite 100, McLean, Virginia 22102.

8. Upon information and belief, defendant Vivian Katsantonis Esq. resides in the State of Virginia, is currently and was at all times referred to hereafter an attorney and a partner with the law firm WTHF with his principle office located at 8405 Greensboro Drive, Suite 100, McLean, Virginia 22102.

9. Upon information and belief, defendant Christopher Anzidei Esq. resides in the State of Virginia with his principle office located at 8381 Old Courthouse Road, Suite 160, Vienna VA 22182, and was at all times referred to hereafter an attorney and a partner with the law firm WTHF.

10. The law firm of WTHF, Mark Sgarlata Esq., Christopher Brasco Esq., Vivian Katsantonis Esq., and Christopher Anzidei Esq. are referred to hereafter as "Defendants"

11. The Defendants in this complaint are currently the attorneys of Safeco

Insurance Company of America ("Safeco") in an action brought in the Eastern District of New York by Safeco against the plaintiffs and other parties – *Safeco Ins. Co. etc. v. M.E.S., Inc. et. al.* (Case No.: 1:09-cv-03312), and in another action also pending in the Eastern District of New York – *M.E.S., Inc. et. al. v. Safeco Ins. Co. et. al.* (Case No.: 1:10-cv-2798)

## FACTUAL BACKGROUND

### Introduction

12. George Makhoul founded MES in 1992 to perform Design-Build and General Construction work.

13. Since 1998, the U.S. Department of Defense has been MES' sole customer; where MES, an expert in the Design/Build of highly complicated structures for explosives, ordinances, and ammunitions storage, as well as weapon testing facilities, was recognized and qualified as such by the Department of Defense.

14. The New York District of the U.S. Army Corps of Engineers ("COE" or "Corps" or "Government") awarded MES a medal of accomplishment in 2004 for MES' contributions and quality work.

15. From 2003 to 2008, Safeco has provided MES in excess of thirty bid bonds for predominately design/build projects that MES submitted proposals for, varying in size from $10 Million to over $70 Million each.

16. In April 2008, Liberty Mutual Insurance Company ("Liberty Mutual"), its affiliates and parent companies purchased Safeco Insurance Company of America and its parent company.

17. Since 1998, MES was awarded several projects by the COE. Between September 2003 and September 2006 MES was awarded three projects by the COE which lead to the circumstances described below.

18. Although MES and George Makhoul personally have been represented by counsel since 1992, specifically by Zawisny & Zawisny PC and by Payne Hackenbracht & Sullivan PC (which merged with Cohen, Seglia, Pallas, Greehall & Furman PC), when it came to dealing with the Army Corps of Engineers with respect to the three projects that are at the heart of this complaint, MES and George Makhoul individually were persuaded by

WTHF's attorneys and Safeco to rely on the Defendants to represent the plaintiffs for all of their dealings with the COE on the three projects starting in March 2008. Between March 2008 and January 2009, believing that the Defendants were representing the plaintiffs and therefore acting in their best interest, the plaintiffs permitted them to conduct all negotiations on behalf of MES and George Makhoul with the COE without the involvement of MES' and George Makhoul's regular attorneys. The Defendants continued the representation of the plaintiffs when dealing with the U.S. Department of Labor until at least April 28, 2009.

19. As explained in detail below, the plaintiffs lost the ability to obtain Government contracts, had no income since 2008, expended MES' capital and George Makhoul's savings by executing the work that the Defendants counseled them to perform and by defending against Safeco's suit, lost a 20 year old thriving business with exceptional and unique capabilities and expertise; all due to the Defendants' actions.

**WTHF's and its Attorneys' past representation of the plaintiffs**

20. The Defendants spent hours and days discussing legal strategy with MES' personnel and in negotiating with the Corps without any involvement by other MES' counsel. The Defendants were the sole attorneys that represented the plaintiffs in negotiations with the Corps of Engineers' attorney for the period between March 2008 and January 2009. In fact, the Defendants, as explained below when describing their actions in regard to each project specifically, represented both Safeco and the plaintiffs in dealings with the COE from March 26, 2008, to at least April 28, 2009. During this period of time the plaintiffs looked to and relied on WTHF and its attorneys exclusively for legal advice and representation of their interests against the COE, which was seeking to and did default MES' contracts. From March 26, 2008 to April 28, 2009, the Defendants met with the plaintiffs and:

a) Advised and convinced the plaintiffs to join the completion team with Safeco after the termination of Project I.
b) Advised and guided MES on its defense options against the COE, and convinced the plaintiffs not to initiate any immediate legal actions against the COE, and to allow Safeco to complete Project I despite the fact that the COE

was in default of its contract with MES because it lacked congressionally appropriated funds and was in violation of the Anti-Deficiency Act.

c) Advised and counseled the plaintiffs to assist Perini and others in the completion work, by providing all technical data and assistance for the completion of Project I and II.

d) Represented and counseled MES and HMES in preparation for and at the September 16, 2008, Notice To Cure meeting with the COE, and participated as MES' counsel in the discussions and resolutions of the technical issues against the COE on Project II long before its termination.

e) Represented and counseled MES and HMES (from September to November 2008) in the negotiations with the COE that led to the Memorandum Of Understanding ("MOU") on Project II before its termination.

f) Represented and counseled the plaintiffs to protect their interest when drafting the terms of the MOU against the COE on Project II before its termination.

g) Represented MES and HMES in negotiating with and convinced the COE to accept the terms of the MOU that WTHF's attorneys drafted on behalf of MES and HMES before the termination of Project II.

h) Advised and counseled MES in the review of the US Department of Labor's allegations of hourly underpayments on all three projects, including WTHF's discussions with the DOL as counsel for MES.

i) Sent bills to the plaintiffs for its services through Safeco.

**WTHF's and its attorneys' representation of the plaintiffs in PROJECT I: Pyrotechnics Research and Technology Facility**

21. The U.S. Army by and through the New York District of the Corps of Engineers, awarded Contract No. W912DS-06-C-0023 ("Contract I") to MES to construct a Pyrotechnics Research and Technology Facility ("Project I") at Picatinny Arsenal in Dover, New Jersey on September 29, 2006 for a lump sum amount of $10,628,832 and duration of 547 calendar days.

22. On or about October 4, 2006, Safeco provided performance and payment bonds as Surety to the Project for its Principal, MES. George Makhoul personally

indemnified Safeco for the stated bonds.

23. After award of Contract I to MES, several defects in the specifications of the project were found and the Government directed several changes in the scope of the project.

24. In addition to work performed by MES under Contract I but unpaid for by the Government, the COE directed MES to perform work above and beyond the contract requirements and delayed the progress of the work without paying for that additional work. Consequently, MES submitted to the Contracting Officer 37 Requests for Equitable Adjustment. MES is owed $1,620,197 in unpaid invoices and Requests for Equitable Adjustment and claims.

25. Notwithstanding the fact that the COE's own investigation identified the defective design and recognized MES' entitlement for compensation, the COE did not process any of MES' Requests for Equitable Adjustment to Contract I for the additional work performed by MES and for the delays caused by the COE because it did not receive any additional funding and appropriation for Project I.

26. The COE was in default of Contract I with MES before June 2007. Under the Federal Acquisition Regulations ("FAR") the COE was obligated to terminate Contract I for the convenience of the Government.

27. Instead of terminating Contract I for the convenience of the Government, the COE, before any type of termination was even declared, decided to involve the Surety, Safeco, with the hope that Safeco would agree to fund and complete Contract I while the COE sought additional Government funding. This was a clear violation of the Anti-Deficiency Act ("ADA"), and Congressional Appropriation.

28. Safeco, under pressure from the COE, agreed to take over the completion of the project, which first required the COE to wrongfully terminate Contract I for Default to trigger the performance bond obligation and enable Safeco's takeover arrangement.

**a) Defendants' failure to disclose the conflicts of interest to the plaintiffs:**

29. From the outset, the interest of the plaintiffs were in direct conflict with those of Safeco as a result of Safeco's actions including but not limited to Safeco's

tortious interference in MES' contract with the Government and Safeco's decision to complete Project I, among other actions detailed below. The Defendants were privy to Safeco's actions but failed to advise the plaintiffs of this conflict.

30. Despite this clear conflict of interest, the Defendants undertook the representation of the plaintiffs while at the same time representing Safeco against the COE until January, 2009.

31. The Defendants continued to simultaneously represent the plaintiffs and Safeco against the COE without disclosing the actual conflicts of interest to MES and George Makhoul and without obtaining their informed consent thereto.

**b) Defendants' failure to recognize the COE's default and its violation of the Anti-Deficiency Act:**

32. Throughout the Defendants' representation of the plaintiffs, MES advised the Defendants of information and documents which would conclusively establish that the COE had breached MES' contract, acted in violation of the ADA, and did not have the appropriated funding to complete Project I, however, the Defendants failed to use this information and these documents to challenge the COE's wrongful termination of Project I or to prevent the terminations of the other projects.

33. Throughout their representation of the plaintiffs, the Defendants also failed to advise the plaintiffs to pursue timely and urgent remedies and take steps against the COE for its breach of its contracts with MES.

34. Despite the fact that all of the above was explained to the Defendants, and despite the fact that the Defendants were aware that the bond obligee, the COE, was in material breach of Contract I with MES and in violation of the ADA by pursuing Government contracts that were not funded; the Defendants, while representing both Safeco and the plaintiffs, counseled Safeco to proceed with the takeover of the completion of the project. The Defendants, professing to be experts on surety and construction law, knew or should have known that the COE's actions excused MES' Performance Bond obligations and released Safeco of its obligations to the COE to complete the project.

**c) Defendants' failure to advise plaintiffs to act as a result of Safeco's interference with MES' Contract with the Government:**

35. Before Contract I termination, the plaintiffs informed Safeco repeatedly and clearly that Safeco was not permitted to attend any meetings between MES and the COE, that its mere presence, not to mention negative participation, would erode MES' leverage with the COE and that its participation would interfere with and weaken MES' position with the COE to the detriment of the Project and MES. The plaintiffs informed the Defendants of Safeco's contract interference when they began to represent Safeco and the plaintiffs and requested that a stop be put to that interference and that no meeting with the COE be attended by Safeco without the presence of MES.

36. On January 31, 2008 and March 13, 2008, the COE and Safeco met in New York where Safeco agreed, six days after they learned of the issuance of the termination letter to MES, to takeover the completion of the project without conducting a proper and independent investigation into the circumstances of the termination.

37. After the COE found in Safeco a willing accomplice to participate in a deliberate deprivation of MES' rights in an effort to shift blame from the COE's defective project planning and design to MES, and to divert any scrutiny of Anti-Deficiency Act violations by the COE, Safeco was paid the amount owed to MES for work performed by MES prior to termination.

38. The Defendants, at the time when they were representing Safeco and the plaintiffs, counseled Safeco to ignore Safeco's tortious interference with MES' Contract with the Government and to proceed colluding with the COE against the interests of MES and its indemnitors.

39. Throughout the representation of the plaintiffs, the Defendants failed to advise them to pursue timely and urgent remedies and take steps against Safeco for its tortious interference in MES' Contracts, for Safeco's collusion with the COE, for Safeco's bad faith conduct, and for Safeco's actions as further detailed below.

**d) Defendants' misrepresentations and breach of their fiduciary duty to plaintiffs:**

40. Shortly after the COE terminated MES' Contract I on March 5, 2008,

Safeco requested that MES provide it with MES' 2007 year end Financial Statements.

41. Safeco discovered that MES was owed for change order work performed and claims on the three Picatinny Arsenal projects in excess of $7,000,000 exclusive of interest.

42. At the time when the Defendants met with the plaintiffs after the termination of Project I, and after informing the plaintiffs of their intention to represent them against the COE, and while WTHF was negotiating for Safeco a takeover agreement with the COE; WTHF wanted to collect as much data as possible on MES' claims and Requests for Equitable Adjustment ("REA") purportedly to maximize their negotiations and strategies against the COE and to obtain the best possible concessions from the COE.

43. Preaching a unified front between Safeco and MES against the COE's actions and wrongful termination, the Defendants, while representing the interest of the plaintiffs against the COE explored, researched, and solicited from the plaintiffs:

a. All its defenses against the termination,

b. Highly specialized technical information needed to understand MES' claims and REAs against the COE,

c. Confidential information from MES incriminating the COE, and

d. Significant data for negotiating the Takeover Agreement with the COE to minimize MES' losses and maximize its leverage against the COE.

44. The Defendants, while representing the interest of the plaintiffs against the COE and after obtaining the data listed above from the plaintiffs, actually:

a. Compromised MES' defenses against the termination in Safeco's settlement talk with the COE at the expense of MES,

b. Offered MES' claims and REAs against the COE as a concession towards a settlement with Safeco at the expense of MES,

c. Handed Safeco the confidential information obtained from MES that could be used by Safeco against MES, and

d. Advanced Safeco's agenda and protection at the expense of MES, and lied to MES indicating that it is the COE that was adamant on these unfavorable positions rather than Safeco.

45. Immediately after receiving these documents from MES, the Defendants, while representing the plaintiffs, used that information to insure that the takeover agreement they were negotiating with the COE protected Safeco's interest at the expense

of the plaintiffs by adding statements to that agreement allowing Safeco to gain access and control to the funds in question, while the Defendants were professing the representation and the safeguarding of the plaintiffs' best interest.

46. Throughout the representation of the plaintiffs, Defendants colluded with Safeco and abetted the collusion of Safeco and the COE against the interest of the plaintiffs. This conduct was directly adverse to the interest of the plaintiffs and was not disclosed to them.

47. When Safeco demonstrated a strong interest in the funds that MES expected to receive from the COE on all of its projects, the Defendants, at the time when they were representing Safeco and the plaintiffs, negotiated a takeover agreement with the COE and advised Safeco to collude with the COE by completing the work, in order for Safeco to get its hands on all of MES' receivables and obtain payment from the COE for work performed by MES prior to the termination of Contract I.

**e) Defendants advised Safeco to reject plaintiffs' offer to post collateral on the Pyrotechnics project:**

48. The plaintiffs made Safeco aware that MES was willing, ready, and able to post any reasonable collateral requested by Safeco for Safeco not to complete the project and defer any defense and resolution of the termination to MES. Safeco informed the plaintiffs that it will retain MES' last payment from the COE as security collateral and without demanding any additional collateral from MES rejected the plaintiffs' requests and decided to complete the project.

49. At the advice of the Defendants, Safeco requested, obtained, and reviewed MES' financial statement to ascertain MES' financial position and ability to post collateral.

50. The Defendants, at the time when it was representing Safeco and the plaintiffs, counseled Safeco to reject MES' request to post any reasonable collateral requested by Safeco for Safeco not to complete the project and defer to MES any defense and resolution of the termination to MES.

51. At the advice of the Defendants, Safeco decided to reject the plaintiffs' request to defer the defense to MES of the COE's claim, and to complete the work.

52. The Defendants convinced the plaintiffs that Safeco's takeover of the completion of the project, instead of accepting collateral from MES and denying the COE's bond demand, is a win-win situation and in the plaintiffs' best interest.

53. The Defendants' advice started a chain reaction that ultimately caused the terminations of the other two projects, caused the losses that Safeco is now demanding that the plaintiffs indemnify it for, and brought about the demise of MES in general.

**f) Defendants advised Safeco to takeover the Completion of Contract I before even performing a proper and independent investigation:**

54. On March 26, 2008, a meeting was held at MES' office between representatives of MES, Safeco, Safeco's consultants Cashin, Spinelli, & Ferretti, LLC (CSF), and WTHF to discuss the COE's demand. The plaintiffs informed the attendees that the COE has been in default of its Contract with MES since 2007 and that the COE acted in violation of the Anti-Deficiency Act and the mandated Congressional Appropriation.

55. The plaintiffs also informed Safeco that they will be requesting from the Court of Federal Claims to declare the COE to be in default on its Contract with MES and to convert the termination for default to a termination for the convenience of the Government, releasing Safeco of any obligations under the Performance Bond.

56. The Defendants advised the plaintiffs not to proceed with any Court proceedings at that time.

57. The Defendants advised Safeco to proceed expeditiously with the completion the project without waiting for the results of Safeco's investigation into the termination despite MES' pleadings not to do so.

58. The Defendants advised MES that Safeco did not need to complete its investigation because Safeco's takeover of the completion of the project is a "win-win situation" and in the plaintiffs' best interest.

59. On March 28, 2008, the Defendants informed the COE in writing of Safeco's intent to takeover the completion of Project I.

60. At the advice of WTHF, Safeco insisted on completing the project; and the Defendants advised MES to be a part of the completion team (which, MES discovered

much later, was only a ploy to enlist MES' cooperation).

61. At the time when the Defendants were representing the plaintiffs and Safeco, Defendants advised Safeco, despite MES' objections, to agree to complete the Project for the COE before conducting a proper and independent investigation.

**g) Defendants' misrepresentations to plaintiffs and sham request for MES' participation in the completion of Project I:**

62. At the meetings held between the Defendants and the plaintiffs following the termination of the contract, Mark Sgarlata, Esq. and Christopher Brasco, Esq. of WTHF informed MES that WTHF's attorneys were experts in these matters and are there to represent and help MES prevail against the COE, and asked him to trust WTHF's attorneys and their advice.

63. As requested by the Defendants, MES worked on the agreed takeover plan, which included the identification of the work that will be performed by MES' own workforce, a project work breakdown structure that identifies MES' and the subcontractors' assigned work responsibilities for the completion work, the cost and schedule of values for the completion of the project, and other matters.

64. The Defendants represented both Safeco and the plaintiffs in dealings with the COE. The plaintiffs looked to and relied on the Defendants exclusively for legal advice and representation of their interests against the COE.

65. In fact, the plaintiffs relied solely on the Defendants for advice and for their representation against the COE. None of the plaintiffs' other attorneys contacted, spoke, negotiated, or attended any meetings with the COE's attorney during that period.

66. The Defendants acted in dealing with and towards the plaintiffs in a manner indicative that they were representing the plaintiffs, as they said they would, and protecting the interests of Safeco and the plaintiffs against the COE, giving Safeco and the plaintiffs legal advice on how to proceed. The plaintiffs entrusted and confided in the Defendants to represent their interest against the COE to the extent that the plaintiffs did not find the need for any additional legal representation at the most difficult time in the plaintiffs' existence.

67. The Defendants were advancing Safeco's agenda and protection at the

expense of the plaintiffs, when Mr. Brasco decided to include in the takeover agreement, a clause that would release Safeco of their actions against MES.

68. The Defendants, at the time when they were representing the plaintiffs and Safeco, induced the plaintiffs into assisting Safeco to complete Contract I and into believing that the Defendants were advising the plaintiffs and protecting their interest, while the Defendants were in fact plotting with Safeco to enlist the plaintiffs' cooperation and to provide the impression that the plaintiffs did not need an attorney to represent them because the Defendants were performing that role.

69. After the COE approved the plan prepared by the Defendants on behalf of Safeco and the plaintiffs which included that MES would complete the site work, the plaintiffs committed themselves to financial arrangements and expended time and money in anticipation of performing the work that the Defendants had requested and Safeco agreed to in the takeover agreement.

70. Christopher Brasco of WTHF suggested that Safeco hire two site supervisors from Perini Corporation ("Perini").

71. Consistent with Christopher Brasco's instructions, the plaintiffs brought Perini up to speed with the project, and proceeded with completing the purchasing and the transferring of all subcontracts and negotiating with suppliers and subcontractors for the completion of the project as agreed to with Safeco.

72. At the time when the Defendants were representing the plaintiffs and Safeco, the Defendants misled the plaintiffs into believing that Safeco intended to complete the work with MES by misrepresenting the terms of the proposed takeover agreement to the plaintiffs in order to secure the plaintiffs' cooperation.

73. At the time when the Defendants were representing the plaintiffs and Safeco, the Defendants caused the plaintiffs to incur additional liability and induced the plaintiffs to expend capital in performing work for Safeco post-termination.

74. When negotiating the takeover agreement with the COE on behalf of Safeco and the plaintiffs, the Defendants advanced Safeco's agenda and sought Safeco's protection at the expense of the plaintiffs.

**h) Defendants' involvement in Safeco's contract with Perini:**

75. Safeco's contract with Perini for the completion of Project I departed materially from the terms represented to the plaintiffs by the Defendants and agreed upon by Safeco. Douglas Dearie, the Assistant Vice President of Construction at Safeco's Claim Department informed MES' president, George Makhoul at a meeting held at MES' office, that he was on vacation and did not personally review Perini's contract and that WTHF reviewed that contract for both Safeco and Perini.

76. Perini's contract, which was reviewed and advanced by the Defendants, was tantamount to a blank check from Safeco to Perini to complete the project. Even though MES had identified and secured all the subcontractors and suppliers to complete the work for a completion cost of approximately $6,500,000, Perini proposed to bill Safeco an amount estimated by Perini to exceed $10,500,000.

77. The contract fee was nine percent, more than double the standard fee charged in the industry for that type of contract (Construction Manager not at risk). The contract did not specify a time for completion, or any liquidated damages for Perini's delays, although Safeco's contract with the Government included both. The contract language that was reviewed and approved by the Defendants granted Perini financial incentives to both, delay the completion of the project and increase the construction cost.

78. In late 2009, it became evident that, when requesting the project cost data from the plaintiffs in 2008, the Defendants had only the protection of Safeco's interest in mind, and attempted to get from the plaintiffs all of MES' proof of Safeco's excessive cost, in order to prepare Safeco's defenses against MES' assertions.

79. Defendants arranged for Safeco to employ Perini and approved its contract.

80. At the time when the Defendants were representing the plaintiffs and Safeco, WTHF advised Safeco to enter into agreements with Perini and subcontractors that were excessive and wasteful.

81. At the time when the Defendants were representing the plaintiffs and Safeco, WTHF advised Safeco to unreasonably reject the plaintiffs' offer to complete the work at a much lower cost.

82. At the time when the Defendants were representing the plaintiffs and

Safeco, WTHF advised Safeco to demand that the plaintiffs perform free work or work at a loss for Safeco.

**i) Defendants breached their fiduciary duty to plaintiffs and advised Safeco to retaliate against and terminate its agreement with MES:**

83. When the plaintiffs objected to the Perini's contract as having been entered into in bad faith, Safeco, consulting with WTHF, retaliated by demanding that MES reduce by 20 percent the price already agreed to between Safeco and MES for the site work for which the COE had agreed to in writing in the Takeover Agreement. Safeco threatened to terminate its agreement with MES, if MES did not capitulate.

84. After MES indicated to the Defendants as the plaintiffs' attorneys that Safeco is extorting MES, Safeco terminated the agreement and informed the COE of that decision.

85. At the time when the Defendants were representing the plaintiffs and Safeco, the Defendants advised Safeco to terminate Safeco's agreement with MES to perform work on the project in order to cover-up all of Safeco's wrongdoing.

**j) Defendants failed at counseling plaintiffs of their legal rights as a consequence of the COE's lack of funding and its violation of the ADA:**

86. Just as the plaintiffs had informed the Defendants and Safeco about the COE's lack of funding, the COE experienced funding problems as Safeco attempted to complete the work on Project I. As with MES, and despite the Defendants continuous involvement in the oversight and administration of the completion of the work, the COE directed Safeco to perform additional work to the contract without having funding available or appropriated to this project.

87. The COE ran out of funding appropriated for this project, and ordered Safeco to suspend all work on the project on July 31, 2009, when the project was approximately 80% complete.

88. The Defendants represented and negotiated Safeco's and Perini's claims against the COE for shutting down the project for lack of funding, the same issue which precipitated the wrongful termination that the Defendants advised the plaintiffs and

Safeco on ignoring and agreeing to complete the work despite the fact that the COE did not have any appropriated funding to do so.

89. Defendants counseled Safeco to complete the project, and MES to participate in the post-termination work, while the Defendants were notified that the COE lacked funding and were in violation of the ADA.

**WTHF's and its attorneys' representation of the plaintiffs in PROJECT II: High Energy Propellant Formulation Facility**

90. The U.S. Army by and through the New York District of the Corps of Engineers awarded Contract No. DACA51-03-C-0024 ("Contract II") to Hirani-MES, JV ("HMES"), a New Jersey partnership formed by M.E.S., Inc. and Hirani Engineering and Land Surveying PC, to perform the design and construction on a project known as the High Energy Propellant Formulation Facility, ("Project II"), at Picatinny Arsenal in Dover, New Jersey on September 19, 2003 for a lump sum amount of $16,549,000 and a duration of 1,095 calendar days.

91. On or about September 24, 2003, Safeco provided Performance and Payment Bonds as Surety to Project II for its Principal, HMES. George Makhoul personally indemnified Safeco for the stated bonds.

92. From the onset, after award of Contract II to HMES, several defects in the specifications of the project were found and the Government directed changes in the scope of Project II.

93. In addition to the work performed by HMES under Contract II for which the Government refused to pay, the COE directed HMES to perform work above and beyond Contract II requirements and delayed the progress of the work. Consequently, HMES submitted to the Contracting Officer 42 Requests for Equitable Adjustment. HMES is owed $3,789,796 in unpaid invoices and Requests for Equitable Adjustment and claims.

94. Notwithstanding the fact that the COE's own investigation identified the defective RFP specifications and recognized HMES' entitlement for compensation, the COE did not process any of HMES' Requests for Equitable Adjustment to Contract II for the additional work performed by MES and for the delays caused by the COE because the

COE did not receive any additional funding and appropriation for Project II.

95. The Government was in default of its Contract with MES before June 2008. In accordance with the FAR, the COE was obligated to terminate Contract II for the convenience of the Government.

96. As with Contract I, instead of terminating Contract II for the convenience of the Government, the COE, before any type of termination was even declared, decided to involve Safeco with the hope that Safeco would work toward completion of Project II while the COE sought additional funding. This was a clear violation of the Anti-Deficiency Act, and Congressional Appropriation.

**a) Defendants' failure to recognize the Government default and violation of the Anti-Deficiency Act:**

97. Throughout the Defendants' representation of the plaintiffs, MES advised the Defendants of information and documents which would conclusively establish that the COE had breached MES' contract, acted in violation of the ADA, and did not have the appropriated funding to complete Project II, however, the Defendants failed to use this information and these documents to prevent the termination of the project.

98. Throughout their representation of the plaintiffs, the Defendants also failed to advise the plaintiffs to pursue timely and urgent remedies and take steps against the COE for its breach of its contracts with MES.

99. Despite the fact that all of the above was explained to the Defendants, and despite the fact that the Defendants were aware that the bond obligee, the COE, was in material breach of Contract II with MES and in violation of the ADA by pursuing Government contracts that were not funded; the Defendants, while representing both Safeco and the plaintiffs, acted negligently when they counseled Safeco to interfere in MES' contract with the Government and to commit to the completion the project prior to the termination of the project. The Defendants, professing to be experts on surety and construction law, knew or should have known that the COE's actions excused MES' Performance Bond obligations and released Safeco of its obligations to the COE.

**b) Defendants' failure to properly advise plaintiffs, and breach of their fiduciary duty to plaintiffs:**

100. Safeco interfered with HMES' contract with the COE several months before Contract II was terminated despite HMES' and MES' warnings to Safeco not to do so.

101. On September 16, 2008, HMES met with the COE to discuss a Cure Notice letter that the COE had issued to HMES. Immediately before that meeting, Christopher Brasco, Esq., persuaded again George Makhoul, MES and Hirani to trust him to represent MES and HMES and to negotiate with the COE on behalf of MES and HMES.

102. The Defendants acted in dealing with and towards the plaintiffs in a manner indicative that they were representing the plaintiffs and protecting the interests of MES against the COE, by giving the plaintiffs legal advice on how to proceed. The plaintiffs and HMES entrusted and confided in the Defendants to represent MES' and HMES' interests against the COE to the extent that HMES and the plaintiffs did not find the need for any additional legal representation at the most difficult time in MES' existence and at that meeting.

103. In late 2010, MES discovered that in September and October 2008 when the Defendants negotiated a Memorandum of Understanding ("MOU") with the COE on behalf of MES and HMES; the Defendants required the COE to direct to Safeco payments owed to HMES, and insisted on terms designed to protect the interests of Safeco at the expense of HMES' and MES' interests.

104. From the September 16, 2008 meeting until the termination of Project II on November 4, 2008, drafts of the MOU were emailed back and forth between Safeco, the COE, and the Defendants, who were solely representing the plaintiffs in these negotiations.

105. The Defendants negotiated with the COE on behalf of the plaintiffs. In fact, WTHF's attorneys were the only individuals that negotiated with the COE on behalf of the plaintiffs. The plaintiffs never discussed or negotiated with the COE any of the terms of the MOU.

106. The Defendants met regularly with the plaintiffs to discuss technical

matters without the presence of MES' other counsel. The Defendants, while representing and advising the plaintiffs on how to protect the plaintiffs' interest against the COE, gathered sensitive and confidential information from the plaintiffs.

107. The plaintiffs agreed to meet with the Defendants and allow them to gather confidential information and to question MES' employees without other MES' attorney present, because the Defendants informed MES that these meetings are intended to collect data and to formulate strategies on how Safeco and MES can stand together jointly against the COE.

108. However, the Defendants, while representing the plaintiffs, were protecting and advancing Safeco's agenda at the expense of the plaintiffs, specifically when Mr. Brasco decided to include in the MOU, a clause that would release Safeco of their actions against MES.

109. The plaintiffs found out that, under the pretext of a unified front against the COE's actions, the Defendants explored, researched, and solicited information from MES in negotiating the MOU with the COE on behalf of the plaintiffs, only to advance Safeco's agenda and protection at the expense of the plaintiffs, and lied to the plaintiffs and Hirani blaming the COE as responsible for certain critical and harmful demands from MES in the negotiations rather than Safeco, all while the Defendants were representing the plaintiffs.

110. The Defendants were the exclusive representative of the plaintiffs in negotiating with the Corps of Engineers. MES' other attorneys were not involved because MES relied exclusively on the Defendants for that task.

111. Throughout the representation of the plaintiffs, the Defendants failed to provide competent representation of MES and George Makhoul, but instead focused on the representation of Safeco.

112. Throughout the representation of the plaintiffs, the Defendants issued billing statements to Safeco for legal services rendered on behalf of MES and Safeco and asked Safeco to forward said statements to MES; and accepted payment from Safeco for these services.

113. The Defendants bills were presented to MES for payment of the legal services rendered by the Defendants on behalf of the plaintiffs.

114. At the time, MES agreed to pay the Defendants bills for its representation, and wanted to offset them against payments due to it from Safeco for work requested of MES by Safeco and the Defendants.

115. The Defendants urged MES to continue to work at the site, while the Defendants negotiated the MOU with the COE despite the fact that the COE was not paying HMES or MES for the work performed since June 2008. MES followed the Defendants' advice and, at a substantial cost, increased substantially the labor force and the production of work to satisfy the Defendants, Safeco, and the COE.

116. Throughout the representation of the plaintiffs, the Defendants advised the plaintiffs that they had an obligation to indemnify Safeco and pay the attorneys' fees of Safeco, cooperate with and comply with all of Safeco's directives, continue to perform work and expend funds to complete the projects while not being paid by the owner, perform all work requested by Safeco without being paid for it, agree with all of Safeco's decisions, and Safeco's undertakings, acceding to Safeco's requirements to be indemnified and waive all of MES' and its indemnitors rights against Safeco, all along while the Defendants knew that Safeco was acting illegally and in bad faith, and all along while advising Safeco on its undertakings.

117. On October 3, 2008, - one month before the termination was issued - the COE and Safeco signed an arrangement to have the COE pay Safeco directly. MES later found out that it was Safeco, under the direction of the Defendants, that demanded that the COE not pay HMES for work MES had already performed until an agreement is signed requiring that all proceeds go to Safeco. However, when the COE objected to certain language introduced by WTHF into the MOU to describe the funds distribution, and other references to liabilities, the Defendants advised the plaintiffs and Hirani to agree to Safeco's demands and execute a Letter Of Understanding ("LOU") with Safeco that would contain whatever the COE objected to being included in the MOU.

118. Safeco also requested from MES to execute that LOU, as a waiver of their rights against Safeco and an acknowledgment that the Indemnity Agreement would survive all of Safeco's actions to that date on this project. Although Mr. Brasco had convinced MES to trust him and requested that MES execute the LOU he personally drafted, MES objected to the paragraph that had MES waive their rights against Safeco.

119. The Defendants induced the plaintiffs into executing an agreement with the COE on Contract II and to believe that the Defendants were advising and protecting HMES' and MES' interest, while the Defendants were in fact plotting with Safeco to enlist the plaintiffs' cooperation and to provide the impression that the plaintiffs did not need an attorney to represent them because the Defendants were performing that role.

120. In an attempt to blackmail the Joint Venture, Safeco, following WTHF's advice, threatened the Joint Venture that it would not sign the MOU – that WTHF negotiated with the COE on behalf of MES – unless the Joint Venture, Hirani, and the plaintiffs, signed Safeco's version of the LOU first.

121. When the parties could not agree on the LOU that Safeco made a prerequisite to signing the MOU, Hirani sought judicial intervention to persuade the parties to execute the MOU that Safeco, the COE, and the Joint Venture agreed to execute.

122. On October 30, 2008, WTHF and Safeco indicated to Justice Austin at the New York State Supreme Court that Safeco will sign the MOU avoiding the COE's termination of HMES' Contract, only for Safeco, at the direction of WTHF, to come back later, and insist that MES and Hirani sign a release for Safeco's interference and actions otherwise the MOU would not be signed by Safeco.

123. When Hirani and MES refused to sign Safeco's version of the LOU, the Defendants and Safeco told the COE to pull the plug on HMES and terminate the contract. In its discussions with the COE, the Defendants clearly indicated that Safeco would willingly complete the contract with the COE if HMES' contract was terminated. This induced the COE to terminate Contract II for default even though the COE knew the termination was not justified.

124. The Defendants advised Safeco to interfere with MES' Contract with the COE effectively orchestrating the termination for default of Contract II by colluding with the COE against the interests of MES and its indemnitors long before the COE had declared the contract in default.

125. The Defendants advised Safeco to agree to complete the work in order for Safeco to get its hands on all of MES' receivables and obtain payment for work performed by MES prior to the termination of Contract II.

126. The Defendants advised Safeco to renege on its agreement with the Joint Venture to execute the MOU that the Defendants negotiated with the COE on behalf of the plaintiffs, although WTHF and Safeco assured Justice Austin at the New State Supreme Court that Safeco would sign said MOU.

127. Safeco asked the COE for a period of four months prior to the contract termination not to pay the Hirani/MES Joint Venture, while demanding that MES continue to work.

128. The Defendants advised the plaintiffs to continue to work although MES was not being paid, in order to have the plaintiffs expend its capital on the Project while Safeco requested that the COE withhold payment on MES, in order to bill the COE for that work at a later date.

129. Throughout the representation of the plaintiffs, the Defendants were fully aware of all claims that could have been asserted against Safeco and the COE. However, the Defendants were negligent when they failed to advise plaintiffs to do so and to pursue plaintiffs' rights against the COE.

130. Throughout the representation of the plaintiffs, the Defendants breached the standard of care in failing to competently represent the plaintiffs, and continuing to make the plaintiffs believe of said representation despite a blatant conflict of interest.

**c) Defendants advised Safeco to complete Contract II before even performing a proper and independent investigation:**

131. On December 17, 2008, MES met with Safeco, CSF, and WTHF at MES' office to discuss the COE's demand of Safeco to complete Project II. MES informed the attendees that the COE has been in default of its Contract with MES long before June 2008 and that the COE acted in violation of the Anti-Deficiency Act and the mandated Congressional Appropriation.

132. The plaintiffs also notified Safeco and the Defendants that Safeco's Performance Bond was never increased to cover any of the contract modifications that increased the contract amount. Hence, all the remaining work on the project constituting change order work directed by the COE, was not bonded, releasing Safeco of any obligations under the Performance Bond.

133. The Defendants advised the plaintiffs that Safeco did not need to complete its investigation because Safeco's takeover of the completion of the project is a win-win situation and in the plaintiffs' best interest.

134. WTHF advised Safeco to proceed expeditiously with the completion of the project without waiting for the results of Safeco's investigation into the termination despite of MES' pleadings not to do so.

135. On January 15, 2009, three weeks after the termination of a project valued at over $20,000,000 (once all of the change orders are paid for) which was over 93% complete, and before conducting a proper and independent investigation, the Defendants informed the COE in writing of Safeco's intent to takeover the completion of Project II.

136. When Safeco started negotiating a proposed takeover agreement with the COE, and as Safeco's investigation into the project termination progressed, the Defendants began to insist on receiving from the COE project funding documentation and certification of compliance with the ADA on all three projects.

137. On September 23, 2009, Safeco decided based on WTHF's recommendation, not to proceed with the completion of the project for several reasons, particularly due to the inability of the COE to demonstrate that adequate funding was available to complete the project and the unwillingness of the COE to certify compliance with the ADA.

138. When the COE admitted to Safeco and WTHF the lack of funds for the Pyrotechnics project, Safeco informed the COE, pursuant to WTHF's advice, that the COE's failure to affirm to Safeco whether adequate funding exists for the completion of Project II was the reason that Safeco has not taken over the project.

139. However, despite the COE's inability to provide Safeco with project funding documentation and certification of compliance with the ADA, WTHF's representatives later reached an agreement with the COE on behalf of Safeco. On December 3, 2009, Safeco and the COE executed a takeover agreement, where Safeco would complete Project II by receiving additional compensation for all of the additional work that HMES had been directed to perform for which no funding was available and for which HMES' contract was wrongfully terminated.

140. As of February 5, 2010, the COE had failed to deliver to Safeco and

WTHF confirmation of funds availability to complete the work despite the fact that the COE had issued to Safeco a Notice To Proceed on January 19, 2010.

141. At the time when the Defendants were representing the plaintiffs and Safeco, the Defendants advised Safeco, despite the plaintiffs' objections, to agree to complete the Project for the COE without conducting a proper and independent investigation.

142. The Defendants advised Safeco to comply with the COE's demand to complete Contract II when HMES had completed its original bonded Contract with the COE, hence discharging Safeco from any liability under the bond to the Government.

**WTHF's and its attorneys' representation of the plaintiffs in PROJECT III: Explosive Research and Development Loading Facility**

143. The U.S. Army by and through the New York District of the Corps of Engineers awarded Contract No. W912DS-05-C-0006 (hereafter "Contract III") to MES to construct an Explosive Research and Development Loading Facility (hereafter "Project III") at Picatinny Arsenal in Dover, New Jersey on February 11, 2005 for a lump sum amount of $7,262,975 and duration of 630 calendar days.

144. On or about February 28, 2005 Safeco provided Performance and Payment Bonds as Surety to the Project for its Principal, MES. George Makhoul personally indemnified Safeco for the stated bonds.

145. After award of Contract III to MES, several defects in the specifications of the project were found and the Government directed several changes in the scope of the project.

146. In addition, the COE directed MES to perform work above and beyond the Contract III scope of work and delayed the progress of the work. Consequently, MES submitted 28 Requests for Equitable Adjustments. MES is owed $1,898,512 in unpaid invoices and Requests for Equitable Adjustments and claims.

147. The Government was in default of its Contract with MES before September 2008.

148. As with Contracts I and II, the COE decided to involve the Surety and WTHF with the hope that WTHF would convince the Surety to work toward completion

of Contract III while the COE sought additional funding. This was a clear violation of the Anti-Deficiency Act, and Congressional Appropriation.

**a) Defendants' failure to properly advise plaintiffs:**

149. Safeco interfered with MES' contract with the COE several months before Contract III was terminated despite MES' warnings to Safeco not to do so.

150. On December 3, 2008, MES met with the COE. Safeco's participation in that meeting signaled that Safeco would cave into the COE's demands no matter how lacking in merit. The COE wanted Safeco to take over and fund the completion of the project to conceal its own inability to secure the necessary funding, because any funds needed for resolving disputes and litigation would come from different resources and not from the project's appropriated funds thereby circumventing the ADA and Congressional Appropriation.

151. In its discussions with the COE, Christopher Anzidei, Esq. of WTHF clearly indicated that Safeco would complete the contract for the COE if MES were terminated. This induced the COE to terminate Contract III for default on December 22, 2008 even though the COE knew the termination was not justified.

152. The Defendants at the time when it was representing Safeco and the plaintiffs, counseled Safeco to ignore Safeco's interference with MES' Contract with the COE and to proceed colluding with the COE against the interests of MES and its indemnitors.

**b) Defendants' failure to properly advise Safeco not to takeover the Completion of Contract I and II as it did for Contract III:**

153. On April 28, 2009, after the COE terminated Project III, MES met with representatives of Safeco and CSF, and two attorneys from WTHF, Christopher Anzidei, Esq. and Vivian Katsantonis Esq.

154. At the April 28 meeting, Defendants also asked MES to help them prepare a defense to a Department of Labor claim asserted in connection with Project I. Defendants and Safeco asserted that WTHF's attorneys were experts in wage claims, and thus, Mr. Makhoul allowed them to represent MES' interests before the Department of

Labor.

155. At that meeting, MES' staff reviewed with Ms. Katsantonis MES' records and documents that they had prepared for the Defendants to represent MES against the DOL, and discussed plans for a response to the DOL issues. Ms. Katsantonis advised MES on how she intended to respond to the DOL's allegations.

156. At no time between March 2008 and April 2009 did any representative of Safeco or WTHF ever inform the plaintiffs or any of MES' employees that WTHF was representing Safeco in any capacity adverse to MES. In fact, even in February of 2009, when Mr. Anzidei of WTHF contacted Michael Payne Esq. an attorney who at the time was engaged by MES for the sole purpose of handling MES' claims at the Armed Services Board of Contract Appeals, Mr. Anzidei confirmed that WTHF was not "appearing in a capacity that is adversarial to MES".

157. As Safeco's investigation into the project termination progressed, the Defendants began to insist on receiving from the COE project funding documentation.

158. The COE's material breach of its contract with MES led the Defendants to advise Safeco not to take over the completion of Project III.

159. While the Defendants recognized that the COE has been in violation of the Anti-Deficiency Act and the mandated Congressional Appropriation on MES' Contracts I, II, and III, the Defendants negligently failed to advise Safeco to reject the COE's demand to takeover Project I and II as they did with Project III

160. The Defendants admitted to the plaintiffs that Safeco's investigation indicated that the COE's Contract III termination was improper; the same conclusion the Defendants and Safeco arrived at for Project I and II.

## LEGAL MALPRACTICE

161. The Defendants while representing the plaintiffs and their interest committed malpractice, acted negligently lacking a duty of standard of care, and breached their fiduciary duties to the plaintiffs. The Defendants breached their duty to fully, professionally and competently represent plaintiffs' interest against the COE, in one or more of the following respects:

a. Defendants failed to inform plaintiffs of the conflicts of interest associated with Defendants' representation of plaintiffs as well as Safeco;

b. Defendants continued to simultaneously represent the plaintiffs and Safeco in dealing with the COE without disclosing the actual conflicts of interest to the plaintiffs and without obtaining their informed consent thereto;

c. Defendants demanded payment from plaintiffs and Safeco for their unethical, illegal, and defective representation and services marred with conflict of interest;

d. Defendants failed to advise plaintiffs to pursue time sensitive claims and urgent actions against the Government for the COE's breach of its contracts with MES and violations of the ADA;

e. Defendants failed to use information and documents provided by MES to challenge the Projects terminations or to prevent the terminations; and failed to advise Safeco to deny the COE's claims;

f. Defendants failed to advise Safeco and the plaintiffs that the COE's material breach of the MES' contracts and their violation of the ADA, excused MES' Performance Bond obligations and released Safeco of any obligation to the COE including the completion of the projects;

g. Defendants counseled Safeco to tortious interfere with MES' Contracts with the Government and to proceed with colluding with the COE against the interests of the plaintiffs;

h. Defendants failed to advise plaintiffs to pursue claims against Safeco for its tortious interference with MES' contracts, its collusion with the COE, and its bad faith and fraudulent conduct;

i. Defendants explored, researched, and solicited from the plaintiffs all of MES' defenses against the terminations and the highly specialized technical information concerning MES' claims against the COE and provided same to Safeco, to compromise them in a settlement between Safeco and the COE at the expense of MES;

j. Defendants explored, researched, and solicited from the plaintiffs confidential information that could be used by Safeco in an action against MES, and provided it to Safeco;

k. Defendants advised Safeco to complete the projects, in order for Safeco to get its hands on all of the plaintiffs' receivables and obtain payment from the COE for work performed by MES prior to the termination of the contracts;

l. Defendants advised Safeco to reject MES' offer to post collateral and deny MES' request to defer the defense of the COE's claims to MES;

m. Defendants advised plaintiffs to concede to Safeco's takeover of the completion of the projects;

n. Defendants advised Safeco to agree to complete the Projects for the COE without conducting proper and independent investigations;

o. Defendants misled the plaintiffs into believing that Safeco intended to complete the work with MES by misrepresenting the terms of the proposed takeover agreement to the plaintiffs in order to secure MES' cooperation;

p. Defendants induced MES to expend funds in performing work for Safeco post project terminations knowing that Safeco will not pay MES for that work;

q. Defendants advised Safeco to enter into agreements with Perini that were excessive and wasteful;

r. Defendants advised Safeco to unreasonably reject the plaintiffs' offer to complete the work at a much lower cost;

s. Defendants advised Safeco to wrongfully terminate Safeco's agreement with MES to perform the site work on the Pyrotechnics project;

t. Defendants explored, researched, and solicited information from the plaintiffs while negotiating the MOU with the COE on behalf of MES and HMES, only to advance Safeco's agenda and protection at the expense of the plaintiffs;

u. Defendants advised, encouraged, and urged the plaintiffs to continue to work on Project II until November 2008, despite the fact that the COE was not paying HMES or MES for the work performed since June 2008.

v. Defendants advised the plaintiffs that they had an obligation to indemnify Safeco, cooperate with and comply with all of Safeco's directives, continue to perform work and expend funds to complete the projects while not being paid by the owner, perform all work requested by Safeco without being paid for it, agree with all of Safeco's decisions and undertakings, acceding to Safeco's requirements to indemnify Safeco and waive all of MES' and its indemnitors' rights against Safeco;

w. Defendants advised Safeco to tortiously interfere with MES' Contract II with the COE effectively orchestrating the termination for default of MES' Contract, and to collude with the COE against the interests of MES and its indemnitors before the COE had declared the contract in default.

x. Defendants advised Safeco to renege on its agreement with the Joint Venture to execute the MOU that the Defendants negotiated with the COE on behalf of

the plaintiffs, although Defendants and Safeco assured Justice Austin of the New State Supreme Court that Safeco would sign said MOU.

y. Defendants advised Safeco to enter into a takeover agreement with the COE on Project II despite the COE's inability to comply with Defendants' request for project funding documentation and certification of compliance with the ADA.

z. Defendants advised Safeco to comply to the COE's demand to complete Contract II when HMES had completed its original bonded Contract with the COE, hence discharging Safeco from any liability under the bond to the Government.

162. But for the forgoing malpractice, negligent acts, errors and/or omissions, and the breach of the standard of care by the Defendants in their representation of the plaintiffs:

a. Plaintiffs would have retained counsel as necessary to protect their interests;

b. Plaintiffs would not have followed WTHF and its attorneys' advice;

c. Plaintiffs would have properly investigated and pursued timely affirmative matters available to them against Safeco, including, but not limited to, the filing of complaints against Safeco for its breach of MES' Indemnity Agreement, its collusion with the COE, and its bad faith and fraudulent conduct;

d. Plaintiffs would have sought timely judicial intervention and filed timely for injunctive relief preventing Safeco from colluding with the COE;

e. Plaintiffs would have sought timely judicial intervention and filed timely for injunctive relief preventing the COE from demanding that Safeco completes the projects given the COE's violation of the ADA and lack of funding;

f. Plaintiffs would have properly investigated and pursued affirmative matters available to them against the COE;

g. Plaintiffs would not have given to the Defendants all of its defenses against the terminations and highly specialized technical information needed to abuse MES' claims and Requests for Equitable Adjustment against the COE, or confidential information that could be used by Safeco in an action against the plaintiffs;

h. Plaintiffs would have insisted that Safeco accept the collateral offered by MES on Project I and denied the COE's demand under the Performance Bond otherwise would have sought timely judicial intervention and filed timely for injunctive relief;

i. Plaintiffs would have insisted that Safeco completes a proper and independent investigation for each of the terminations, where Safeco would have discovered before agreeing to the COE's demand to complete the projects, that the COE's termination of MES' Contracts were wrongful;

j. Plaintiffs would have refused to cooperate with Safeco and the Defendants in the preparation of the takeover plan and would have retained its own counsel to protect their interests against the COE and Safeco.

k. Plaintiffs would not have performed work and expended funds to complete the projects while not being paid by the owner;

l. Plaintiffs would not have performed work requested by Safeco without being paid for it;

m. Safeco, with the objective of mitigating damages, would not have accepted Perini's excessive cost proposal to complete the project but would have rejected Perini's proposal and sought competitive fixed-price bid proposals from other contractors;

n. Safeco, with the objective of mitigating damages, would have accepted MES' offer to complete the projects at a much lower cost than Perini's excessive and wasteful costs;

o. Safeco, with the duty of mitigating damages, would have accepted MES' cost proposal for the site work and retained MES as the site subcontractor;

p. Plaintiffs would have refused to cooperate with Safeco and the Defendants in the preparation of the MOU and would have retained its own counsel to protect their interests against the COE and Safeco;

q. Safeco would have rejected the COE's demand to takeover Project I and II as they did with Project III;

r. Plaintiffs would otherwise have acted in a manner to avoid the negative and adverse economic consequences of the failures, omissions and professional errors of the Defendants.

s. Plaintiffs, with a different retained independent and unbiased counsel, would have prevailed at getting the COE to rescind the termination of Project I, prevented the termination of Projects II and III, reached a resolution of their dispute with the COE, received payments for all of their unpaid invoices and claims from the COE, and would have obtained significant compensation from the COE for its actions.

163. As a direct and proximate result of one or more of the aforesaid professionally negligent, intentional acts, errors and/or omissions constituting malpractice

by the Defendants, the plaintiffs have been injured and damaged in that:

a. They did not hire or get the benefit of independent and unbiased legal counsel to protect their interest against the Government and Safeco which led to the losses that both the plaintiffs and Safeco have incurred and continue to incur;

b. They did not hire or get the benefit of independent and unbiased legal counsel during the negotiations with the Government pre any projects terminations and at the early stages of post projects terminations which would have prevented all of the losses that the plaintiffs and Safeco have incurred and continue to incur;

c. Their interest were not properly represented against the COE or Safeco leading to the losses that the plaintiffs have incurred and continue to incur;

d. They were precluded from asserting valid defenses and affirmative matters and were not permitted to produce their best evidence to prevent the employees of the COE's collusion with Safeco and prevent the losses that ensued;

e. They had to unnecessarily incur expenses as well as other business resources associated with the performance of work demanded by the COE and Safeco and advised to by the Defendants in excess of $2,034,514;

f. They had to unnecessarily incur the cost of the retention of subsequent counsel in order to reduce the damage resulting from Plaintiffs' aforesaid negligent and intentional acts, errors and omissions; and to defend against Safeco's suit and other subcontractors in excess of $3,300,000;

g. They incurred all of the damages that followed the Defendants' failure to challenge the wrongful default terminations of the projects and their failure to require the COE to rescind these terminations:

    i. Loss of payments from the COE for contract work completed by MES, for retainage withheld by the COE, for change order work directed by the COE and completed by MES, for claims for work directed by the COE and completed by MES and payments for delay costs in excess of $7,308,505;

    ii. Loss of return on equipment purchased and investments made by MES for the performance of the project, and unrecoverable cost expended for that project in excess of $777,871;

    iii. Loss of expected profit not realized due to the contracts terminations in excess of $3,500,000;

h. Loss of the profit on work transferred from MES to Perini (same as g.iii);

i. Loss of the value of the entity "MES" as a profitable and specialized business in excess of $12,500,000;

j. Any loss that MES or its indemnitors may be liable for to Safeco currently demanded by Safeco at $13,325,000;

k. MES' lost profits from 2009 to 2011 in excess of $9,000,000;

l. George Makhoul's lost income from 2009 to 2011; and

m. Were otherwise injured and damaged.

## COUNT I
**(Legal Malpractice)**

164. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 163 above.

165. Defendants had an attorney-client relationship with the plaintiffs from March 2008 to April 2009.

166. In so doing, Defendants impliedly represented that they were familiar with the rules regulating practice in construction and surety matters, and with such principles of law in relation to such matters as are well settled in the practice of law, and that they would exercise that degree of skill commonly used by a member of the legal profession.

167. Defendants, each individually and in combination, owed the plaintiffs the duty of possessing and exercising that degree of learning, knowledge, skill and care commonly known and used by ordinary members of the legal profession.

168. Defendants, each individually and in combination, failed to exercise that degree of learning, knowledge, skill and care commonly known and used by ordinary members of the legal profession, and were otherwise negligent.

169. Plaintiffs would have had a favorable outcome but for Defendants' negligence.

170. Defendants' negligence was a proximate cause of the loss sustained by the Plaintiffs.

171. As a result of Defendants' negligence, and without any want of care on the part of the plaintiffs, the plaintiffs suffered actual damage.

172. As a result of the foregoing, the Plaintiffs have been damaged in an amount that exceeds $51,745,890 exclusive of interest or costs, to be further determined at trial.

## FIDUCIARY DUTY AND DUTY OF CARE TO GEORGE MAKHOUL INDIVIDUALLY

173. George Makhoul in his individual capacity has executed indemnity agreements for MES in favor of Safeco Insurance Company of America in relation to Project I, II, and III.

174. George Makhoul personally, in his capacity as indemnitor to MES met with the Defendants, without any other attorney representing his interest, throughout the period from March 2008 to January 2009, and agreed to have the Defendants represent his interest and the interest of MES in dealing with the COE.

175. Should the relationship between George Makhoul individually and the Defendants described in paragraphs 1 through 162 above, does not rise to the level of an attorney-client relationship; as an alternate to the cause of action pleaded by George Makhoul individually in Count I, George Makhoul individually pleads an alternate second cause of action where Defendants breached their fiduciary duty and a duty of care to George Makhoul individually as a non-client.

## COUNT II

**(Breach of Fiduciary Duty and Duty of Care to George Makhoul Individually)**

176. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 163 and paragraphs 173 to 175 above.

177. Defendants had a fiduciary duty and a duty of standard of care to George Makhoul individually, because Defendants dealt with George Makhoul as an indemnitor to MES in favor of Safeco, who reasonably believed he could rely on Defendants' legal advice.

178. Pursuant to those duties, Defendants were at all times bound to exercise the utmost good faith and standard of care in providing legal advice to a non-client in the

course of interacting with him in pursuing Safeco's business.

179. Defendants breached their fiduciary duty and duty of standard of care to George Makhoul.

180. The breach of Defendants' fiduciary duty and duty of standard of care to George Makhoul was a proximate cause of the loss sustained by the George Makhoul individually.

181. As a result of the foregoing, George Makhoul has been individually damaged in an amount to be determined at trial.

## FIDUCIARY DUTY AND DUTY OF CARE TO MES

182. George Makhoul, in his capacity as president of MES, had 13 meetings with the Defendants totaling approximately 42 hours, and 15 conference calls totaling about 16 hours, without any other attorney representing MES' interest, throughout the period from March 2008 to April 2009, and agreed to have the Defendants represent the interest of MES in dealing with the COE.

183. George Makhoul, at all times of MES' existence, was its sole officer, director, and shareholder and is the sole successor in interest of MES.

184. Should the relationships between MES and George Makhoul as successor in interest of MES and the Defendants described in paragraphs 1 through 162 above, do not rise to the level of an attorney-client relationships, as an alternate to the first cause of action pleaded by George Makhoul as successor in interest of MES in Count I, George Makhoul as successor in interest of MES pleads an alternate third cause of action where Defendants breached their fiduciary duty and a duty of care to MES and George Makhoul as successor in interest of MES as a non-client in the course of interacting with MES in pursuing Safeco's business.

## COUNT III
### (Breach of Fiduciary Duty and Duty of Care to MES)

185. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 163 and paragraphs 182 to 184 above.

186. Defendants had a fiduciary duty and a duty of standard of care to George Makhoul as successor-in-interest of MES, because Defendants dealt with George Makhoul as an officer, director, and shareholder of MES, who reasonably believed he could rely on Defendants' advice.

187. Pursuant to those duties, Defendants were at all times bound to exercise the utmost good faith and standard of care in providing legal advice to a non-client in the course of interacting with MES and George Makhoul as successor-in-interest of MES in pursuing Safeco's business.

188. Defendants breached their fiduciary duty and duty of standard of care to George Makhoul as successor-in-interest of MES.

189. The breach of Defendants' fiduciary duty and duty of standard of care to George Makhoul as successor-in-interest of MES was a proximate cause of the loss sustained by the George Makhoul as successor-in-interest of MES.

190. As a result of the foregoing, George Makhoul as successor-in-interest of MES, has been damaged in an amount to be determined at trial.

## TORTIOUS INTERFERENCE

191. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 160 above.

192. Should the relationships between the plaintiffs and the Defendants described in paragraphs 1 through 163 above, do not rise to the level of an attorney-client relationship, as an alternate to the first cause of action pleaded by the plaintiffs in Count I, the plaintiffs plead an alternate fourth cause of action where Defendants tortiously interfered between the contracts of MES and the COE in the course of interacting with MES in pursuing Safeco's business.

193. Defendants tortiously interfered with MES' Contracts with the Government and colluded with the COE against the interests of the plaintiffs.

194. Defendants tortiously interfered with MES' Contracts with the Government and explored, researched, and solicited from plaintiffs all of its defenses and highly specialized technical information, to offer MES' claims and Requests for

Equitable Adjustment against the COE as a compromise towards a settlement between the COE and Safeco at the expense of the plaintiffs.

195. Defendants tortiously interfered with MES' Contracts with the Government and explored, researched, and solicited from plaintiffs all of its confidential information that will be significant for a settlement between the COE and Safeco at the expense of the plaintiffs.

196. Defendants tortiously interfered with MES' Contracts with the Government and colluded with the COE facilitating and recommending for Safeco to complete the projects.

197. Defendants tortiously interfered with MES' Contracts with the Government and explored, researched, and solicited information from the plaintiffs in negotiating the MOU with the COE on behalf of MES and HMES, only to advance Safeco's agenda and protection at the expense of the plaintiffs.

198. Defendants tortiously interfered with MES' Contracts with the Government and at the request of the COE pressured the plaintiffs to continue to work on Project II despite the fact that the COE was not paying HMES or MES for the work performed since June 2008.

199. Defendants tortiously interfered with MES' Contract with the COE and effectively orchestrating the termination for default of MES' Contracts, by colluding with the COE against the interests of MES and its indemnitors before the COE had declared the contracts in default.

200. Defendants tortiously interfered with MES' Contracts with the Government by advising Safeco to renege on its agreement with the Joint Venture to execute the MOU although Safeco assured Justice Austin of the New State Supreme Court that Safeco would sign said MOU.

201. Defendants tortiously interfered with MES' Contracts with the Government by arranging for an agreement with the COE on Project II on behalf of Safeco despite the COE's inability to comply with Safeco's request for project funding documentation and certification of compliance with the ADA.

## COUNT IV
**(Tortious Interference)**

202. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 160 and paragraphs 191 to 201 above.

203. Plaintiffs were awarded Contracts I, II, and III by the COE to construct Projects I, II, and III at Picatinny Arsenal in Dover, New Jersey.

204. Defendants were aware that MES' Contracts II and III with the COE were valid, subsisting and in full force and effect at the time when Defendants met and contacted the COE before the contract terminations.

205. Defendants improperly and tortiously interfered with MES' Contracts by attending any meetings between MES and the COE, communicating with the COE without the presence of MES, and colluding with the COE at the expense of MES, which in turn eroded MES' leverage with the COE and weakened its position with the COE to the detriment of the Project and MES. Defendants intentionally procured the breach of MES' contracts.

206. The COE wrongfully terminated MES' Contracts based in part on the Defendants' interference in the negotiations between MES and COE, which encouraged the COE's wrongful actions. But for the Defendants' tortious interference with MES' Contracts, the COE would not have breached and terminated its Contracts with MES, but would have obtained additional funding for the completion of the projects, as they later did when Safeco took over the completion projects.

207. Plaintiffs have been damaged by the Defendants' tortious interference in MES' Contracts with the COE in an amount to be determined at trial.

208. In tortiously interfering with the MES' contracts with the COE and engaging in the aforementioned conduct, Defendants acted willfully, with malice, oppression, and moral turpitude, and with a conscious disregard for the rights of the plaintiffs. By reason of the foregoing, Defendants are liable for punitive damages in an amount to be proven at trial.

## UNJUST ENRICHMENT

209. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 160 above.

210. Should the relationships between the plaintiffs and the Defendants described in paragraphs 1 through 163 above, do not rise to the level of an attorney-client relationship, as an alternate to the first cause of action pleaded by the plaintiffs in Count I, the plaintiffs plead an alternate fifth cause of action where Defendants benefited and unjustly enriched themselves at the expense the plaintiffs in the course of interacting with MES in pursuing Safeco's business for which equity and good conscience require restitution.

211. Defendants received payment from MES and Safeco for their unethical, illegal, and defective services marred with conflict of interest to benefit and unjustly enrich themselves at the expense of the plaintiffs.

212. Defendants failed to advise Safeco that the COE's material breach of the MES' contracts and their violation of the ADA, excused MES' Performance Bond obligations and released Safeco of any obligation to the COE including the completion of the projects in order to prolong the need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

213. Defendants counseled Safeco to ignore Safeco's tortious interference with MES' Contracts with the Government and to proceed with colluding with the COE against the interests of the plaintiffs in order to prolong the need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

214. Defendants solicited from plaintiffs all of its confidential information that will useful to them when representing Safeco in an action against the plaintiffs in order to prolong the need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

215. Defendants advised Safeco to complete the projects in order to prolong the need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

216. Defendants advised Safeco to reject MES' offer to post collateral and MES' request to defer the defense of the COE's claims to MES in order to prolong the

need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

217. Defendants advised Safeco to agree to complete the Project for the COE without conducting a proper and independent investigation in order to prolong the need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

218. Defendants advised Safeco to unreasonably reject the plaintiffs' offer to complete the work at a much lower cost in order to prolong the need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

219. Defendants advised Safeco to tortiously interfere with MES' Contract with the COE and effectively orchestrating the termination for default of MES' Contract, by colluding with the COE against the interests of MES and its indemnitors before the COE had declared the contract in default in order to prolong the need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

220. Defendants advised Safeco to renege on its agreement with the Joint Venture to execute the MOU although Safeco assured Justice Austin of the New State Supreme Court that Safeco would sign said MOU in order to prolong the need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

221. Defendants advised Safeco to comply to the COE's demand to complete Contract II when HMES had completed its original bonded Contract with the COE, hence discharging Safeco from any liability under the bond to the Government in order to prolong the need for their services and to benefit and unjustly enrich themselves at the expense of the plaintiffs.

## COUNT V
**(Unjust Enrichment)**

222. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 160 and paragraphs 209 to 221 above.

223. As a result of the unlawful conduct described above, the Defendants have been and will continue to be unjustly enriched by receiving payment for their attorneys' fees since March 2008.

224. No valid, enforceable contract existed between the Defendants and the plaintiffs.

225. The Defendants have benefited from their unlawful acts at the expense of the plaintiffs and it would be inequitable for the Defendants to be permitted to retain any of the ill-gotten gains.

226. Plaintiffs are entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust and inequitable conduct in an amount to be determined at trial.

**WHEREFORE,** The Plaintiffs respectfully requests that this Court enter judgment:

(a) against Defendants as to the First, Second, Third, Fourth, and Fifth Counts as appropriate;

(b) awarding damages upon each count in an amount to be determined at trial, but not less than $51,745,890 in the aggregate;

(c) awarding pre-judgment and post-judgment interest on their damages;

(d) awarding their costs, expenses, disbursements and all fees incurred in connection with this action; and

(e) awarding for the benefit of the Plaintiffs such other and further relief as the Court finds just and proper.

## JURY DEMAND

George Makhoul individually and as successor in interest to M.E.S., Inc. demands a jury trial on all issues so triable.

October 20, 2011

By: G. Makhoul

George Makhoul
Pro Se plaintiff
13 Sunrise Circle
Holmdel, New Jersey 07733
Tel: (732) 739-8882
Fax: (732) 739-8882
gmakhoul@mes-designbuilder.com