UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
GEORGE MAKHOUL,                                         :
                                                        :
                    Plaintiff,                          :
                                                        :          **MEMORANDUM AND ORDER**
        -against-                                       :          11-CV-05108 (PKC) (VMS)
                                                        :
WATT, TIEDER, HOFFAR & FITZGERALD,                      :
LLP, MARK SGLARLATA, CHRISTOPHER                        :
BRASCO, VIVIAN KATSANTONIS,                             :
CHRISTOPHER M. ANZIDEI,                                 :
                                                        :
                    Defendants.                         :
-------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

Plaintiff George Makhoul, in his individual capacity and as successor-in-interest to the

corporation M.E.S., Inc. ("MES"), moves to compel the production of documents withheld as

privileged that, according to Plaintiff, may contain information relevant to whether Plaintiff and

Defendant law firm Watt, Tieder, Hoffar & Fitzgerald, LLP ("WTHF") and individual attorney

Defendants Mark Sgarlata, Christopher Brasco, Vivian Katsantonis and Christopher Anzidei

(hereinafter WTHF and individual Defendants will be collectively referred to as "Defendants")),

had an attorney-client relationship. Docket Nos. 68, 69, 71. The motion to compel is brought in

Plaintiff's action against Defendants alleging legal malpractice, breach of fiduciary duty (arising

out of the alleged attorney-client relationship), tortious interference with contractual

relationships and unjust enrichment. Docket No. 1. Plaintiff argues that if an attorney-client

relationship existed between Plaintiff and Defendants, Defendants may not withhold documents

from Plaintiff based on a claim of privilege.

Plaintiff's motion to compel was originally much broader than just this challenge to

Defendants' assertion of privilege in their privilege log. Magistrate Judge Marilyn Go, who was

previously the presiding magistrate judge on this case, directed Defendants to submit certain documents relevant to portions of that motion to compel for in camera review on the question of whether there was any content relevant to the existence of an attorney-client relationship,[1] and held that, apart from that in camera review, the balance of the motion to compel was denied.[2] This case was transferred to me from Magistrate Judge Go, Docket Entry 2/19/2013.  I conducted the in camera review, and this memorandum and order reflects my decision.  The Court partly grants the motion to compel only insofar as I found some non-privileged material during the in camera review.  This was not the point of the in camera review, but the Court nonetheless has noted non-privileged material that should be produced, if it has not already been produced.  The Court did not, however, find any material relevant and supportive of Plaintiff's position on the discrete question that was the subject of this in camera review, i.e., whether Plaintiff and Defendants had an attorney-client relationship.  It is this aspect of the motion to compel that the Court denies.  This Court thus **grants in part and denies in part** Plaintiff's motion to compel.   Docket No. 68, 69, 70.

---

[1] The in camera review was not meant to review the actual validity of Defendants' asserted privilege, although Magistrate Judge Go indicated that she could reach that question if, in the first instance, she found evidence in a particular document supportive of the existence of an attorney-client relationship.  Docket No. 71 ("This Court finds, given the nature of [P]laintiff's claim and the fact that [P]laintiff is [at this time] without counsel, that in camera review of the documents may be the most efficient way of addressing the dispute by determining, in the first instance, whether any of the documents in dispute are arguably relevant to [P]laintiff's claims.").

[2] Magistrate Judge Go observed that Plaintiff's most recent motion to compel raised anew many issues on which she had already ruled.  Magistrate Judge Go therefore focused on the as-yet unaddressed aspects of the motion to compel implicated by the instant in camera review. Plaintiff inquired whether, pending the in camera review, "Your Honor, are you holding my motion in abeyance?"  Magistrate Judge Go responded:  "No, I'm denying it in large part except for this.  Okay.  Anything else?"  Docket No. 72 at 25:16-17.

## I.   Factual Background[3]

The following facts are derived from Plaintiff's complaint and will be taken as true for the purposes of the Court's discussion of Plaintiff's motion to compel the production of certain privileged documents.

### a.   Basic Description Of Parties And Background Of Dispute

Makhoul was at all relevant times the sole officer, director, and shareholder of the corporation MES.  Id.

MES entered into three construction contracts with the United States Army Corps of Engineers ("COE") and, in relation to those contracts, entered into Indemnity Agreements with Safeco Insurance Company of America ("Safeco").  Id.  By virtue of the Indemnity Agreements, Safeco agreed to be MES's surety in the event MES did not complete work on the three construction projects for the COE.  Id.  Defendant WTHF and the Individual Defendants served as counsel to Safeco in conjunction with the indemnity agreements and on other related matters. Id.; see Safeco v. MES, et al., Case No. 9-cv-3312 (E.D.N.Y), and MES v. Liberty Mutual Surety Group, et al., Case No. 10-cv-2798 (E.D.N.Y).

### b.   The Three Contracts

#### i.   Pyro Project

First, the COE awarded a contract to MES to construct a Pyrotechnics Research and Technology Facility ("Pyro Project") in Dover, New Jersey.  Id. ¶ 21.  According to the terms of the Pyro Project contract, MES was to build the facility in 547 calendar days for a lump sum amount of $10,628,832.  Id.

The COE identified some defects in the project specifications and ordered changes.  Id. ¶

---

[3] This factual summary is intended as basic background from which to understand Plaintiff's motion to compel.  Additional detail may be found in Plaintiff's complaint.  Docket No. 1.

23.  These changes had repercussions for Pyro Project's schedule and budget, and after various discussions between MES and the COE that did not satisfy the COE, the COE terminated its contract with MES and requested that Safeco as surety complete the Pyro Project.  Id. ¶¶ 26-29.

### ii.  HEPFF Project

Second, the COE hired MES and Hirani Engineering and Land Surveying PC ("Hirani") in a joint venture called the Hirani-MES, JV ("HMES"), to construct a High Energy Propellant Formulation Facility ("HEPFF Project") in Dover, New Jersey.  Id. ¶ 90.  According to the terms of the HEPFF Project contract, HMES was to build the facility in 1,095 calendar days for a lump sum amount of $16,549,000.  Id.

The COE identified some defects in the project specifications and ordered changes.  Id ¶ 92.  These changes had repercussions for HEPFF Project's schedule and budget, and after various discussions between HMES and the COE that did not satisfy the COE, the COE terminated the contract with HMES and requested that Safeco as surety complete the HEPFF Project.  Id. ¶¶ 96-97.

### iii.  ERDLEF Project

Third, the COE hired MES to construct an Explosive Research and Development Loading Facility ("ERDLEF Project") in Dover, New Jersey.  Id. ¶ 143.  According to the terms of the ERDLEF Project, MES was to build the facility in 630 calendar days for a lump sum amount of $7,262,975.  Id.

The COE identified some defects in the project specifications and ordered changes.  Id ¶ 145.  These changes had repercussions for ERDLEF Project's schedule and budget, and after various discussions between MES and the COE that did not satisfy the COE, the COE reqested that Safeco complete the ERDLEF Project.  Id. ¶ 148.

### c.   Defendants' Alleged Representation Of Plaintiff Makhoul And MES

The central allegation of Plaintiff's complaint against Defendants is that when the COE and MES were at loggerheads with respect to delays and budgetary problems relating to the three projects, Defendants as attorneys represented both Safeco and Plaintiff against the COE from March 2008 through early 2009 in an effort to cure MES's default on the contracts with the COE, to avoid termination of the contracts and to mitigate losses through Safeco's takeover of the contracts and use of MES as a subcontractor.  Id., passim.  According to Plaintiff, he suffered great detriment as a result of that dual representation, because he was unaware that Defendants solely represented Safeco's interests in negotiations with the COE at Plaintiff's expense, damaging Plaintiff's opportunity to salvage the three construction contracts in the process and paving the way for Safeco to take them over without MES participating as it wished.  Id.

### d.   Defendants' Motion To Dismiss And District Judge Gleeson's Referral Of The Case To Magistrate Judge Go To Manage Limited Discovery

Defendants filed a motion to dismiss Plaintiff's complaint in its entirety before District Judge John Gleeson, who along with Magistrate Judge Marilyn Go, originally presided over the instant case.  Docket Nos. 16, 17, 18, 19, 20.  Plaintiff opposed.  Docket Nos. 28, 29.  Defendants replied.  Docket No. 35.  Defendants submitted various documents, many dating from the period of Defendants' supposed representation of Plaintiff, as exhibits in support of their motion to dismiss, arguing that Defendants never represented Plaintiff.  Docket Nos. 17, 19 (submitting thirty-six exhibits to the Court).  For example, in a document dated October 29, 2008, Safeco Claims Representative Caryn Mohan-Maxfield wrote to MES and HMES regarding a court date pertaining to the HEPFF Project and stated that "[Defendant attorney] Chris [Brasco] and I can be at the courthouse by noon and we invite both of you, as well as your respective attorneys if so desired by you, to meet with us sometime around noon."  Docket No. 17, Exh. 28.

5

District Judge John Gleeson held oral argument relating to Defendants' motion to dismiss. <u>Docket Entry 4/27/2012</u>. At the close of oral argument, District Judge Gleeson denied Defendants' motion to dismiss the case, <u>Docket No. 42</u> (handwritten denial of motion), stating that "[Plaintiff] sufficiently alleged for purposes of a 12(b)(6) motion that [Plaintiff] was represented by [WTHF]," <u>Docket No. 54</u> (transcript of 4/27/2012 oral argument).

District Judge Gleeson stated, "I think the only real question here is whether or not a reasonable jury could decide in your favor on the issue that I told you I'm not persuaded on, that is, whether [WTHF] had [an] attorney-client relationship with [Plaintiff]." <u>Id.</u> In order for that issue to be ripe for determination on summary judgment cross motions, District Judge Gleeson stated that "there's not a whole lot more to put in front of me. It can be put in front of me by affidavit if it has to be, so that I can get this postured in a way where I decide whether or not a reasonable jury could conclude that [WTHF] actually had an attorney-client relationship with MES. If it could so conclude, then maybe we have a trial. If not, I think all [Plaintiff's] claims fall. I think all your claims stand or fall with that one discrete factual issue." <u>Id.</u> "So why don't we do whatever needs to get done to posture cross motions for summary judgment." <u>Id.</u>

District Judge Gleeson referred the case to Magistrate Judge Go to guide the Parties on "how much [additional] discovery is really warranted." <u>Id.</u> ("It doesn't look like there's that much more work . . . [The motion to dismiss] already looks like a summary judgment motion.").

### e. **Magistrate Judge Go's Discovery Rulings**

Magistrate Judge Go held a discovery conference in order to shepherd discovery in accordance with District Judge Gleeson's instructions. <u>Docket Entry 5/18/2012</u>, <u>Docket No. 46</u>. During that conference, Magistrate Judge Go heard argument from the Parties as to the desired direction of discovery and directed Plaintiff to serve Defendants with one single comprehensive

6

request for interrogatories, admissions and documents.  Id. at 27.  Magistrate Judge Go indicated that discovery on the issue of the attorney-client relationship was sufficiently simple that it could occur quickly and not in stages.  Id. at 23 ("No, no, no no.  You're going to get it all out at one time.").  Magistrate Judge Go limited discovery to documents within a specific date range for each of the three projects.  Id.

Plaintiff later filed a four-page motion for a conference regarding a motion to compel discovery, which contained four additional pages of exhibits detailing his motion for document production.  Docket No. 57.  Defendants filed an opposition.  Docket No. 56.

Magistrate Judge Go then held another discovery conference.  Docket Entry 10/2/2012; Docket No. 63.  Magistrate Judge Go clarified the date ranges relevant to the attorney-client relationship discovery.  Docket No. 64.  She ruled that "discoverable documents are limited to those that refer to plaintiff or MES regarding the following issues and created during the following time periods: (1) the Pyro Project between March 24, 2008 and July 2008; (2) the HEPFF Project between August 2008 and November 4, 2008; (3) the ERDLF Project between September 2008 and January 16, 2009; and (4) Department of Labor violations between January 2009 and April 28, 2009."  Id.

Magistrate Judge Go held another discovery conference.  Docket No. 71.  In the previous discovery conferences, Magistrate Judge Go had resolved various discovery disputes between the Parties relating to interrogatories, admissions and document production.  Going into the January 4, 2013 discovery conference, and as a result of Magistrate Judge Go's efforts, Plaintiff had received 35,511 pages of documents; 19 interrogatory responses; and 76 answers to requests for admission.  Docket No. 67.  Magistrate Judge Go stated that "insofar as [P]laintiff is challenging the [D]efendants' supplementary responses ordered by this Court to [P]laintiff's interrogatories

and requests for admission, this Court finds the [Defendants'] responses sufficient." Docket No. 71.

At issue was Plaintiff's challenge to Defendants' 996-entry privilege log, Docket No. 57, which he had supplemented with a revised motion to compel just days earlier, Docket Nos. 68, 69, 70.[4]  Magistrate Judge Go observed that Plaintiff's supplemental motion ignored her earlier ruling that set a narrowed time frame for discovery because Plaintiff was seeking discovery that he could also use in one of the related litigations and stated that "such an approach is not appropriate." Docket No. 71.

Magistrate Judge Go ruled that the first step to settling the privilege dispute was to conduct an in camera review of a sample of documents from Defendants' privilege log to determine whether they contained any information relevant to the existence of an attorney-client relationship between Plaintiff and Defendants.  Id.  To that end, Magistrate Judge Go directed Plaintiff Makhoul to identify twenty documents that he wished to serve as the sample for in camera privilege review, and she ordered Defendants to submit these twenty documents to the Court.  Id.  Magistrate Judge Go also directed Defendants to submit Defendant WTHF's unredacted billing records so that she could review them for evidence that Plaintiff and Defendants had an attorney-client relationship.[5]  Id.  Finally, she directed Defendants to submit

---

[4] Given the sophistication of this motion, it may be that Plaintiff has worked with an attorney on this motion, filed when Plaintiff was pro se.  The pro se Plaintiff submitted a 684-page revised motion to compel that included Plaintiff's thirty-one page affidavit, a sixty-page memorandum of law, fifty-seven tabbed exhibits, and three tabbed appendices.  If an attorney was involved in the preparation of the motion, Plaintiff should be aware that such undisclosed involvement of an attorney is not permitted in this District.

[5] Magistrate Judge Go also told Defendants that while the Court intended to conduct an in camera review of the unredacted billing records to determine whether they contain any evidence of an attorney-client relationship between Plaintiff and Defendants, she encouraged Defendants to review their billing-record production to assure that they have produced as much non-privileged

to the Court any privileged documents which refer in some way to Defendants' communications

with Plaintiff or any managerial level MES employee so that those documents could be reviewed

for evidence to support the position that Plaintiff and Defendants had an attorney-client

relationship.[6] Id. ("[W]e will make an in camera inspection to see if any of them have any

bearing on the existence of an attorney-client relationship.").

      Defendants submitted the three categories of above-described documents for in camera

review in various binders containing sixty documents (but many more pages due to the fact that

many of these documents are many pages long—Document 856, for instance, is an entire binder

unto itself).  Docket No. 80.  Plaintiff responded that he believed the in camera review

submission was deficient because Defendants had not produced certain documents that fell

within the categories ordered for in camera review by Magistrate Judge Go.  Docket No. 81.

Plaintiff listed the various documents he felt, from his review of Defendants' privilege log,

should have been given to the Court for in camera review along with Defendants' other

production.  Id.  Defendants responded that they reviewed Plaintiff's correspondence and

responded that one of the alleged omissions (Document 871) was indeed an oversight and

submitted that document to the Court.  Docket No. 82.  As to the rest of the oversights alleged by

Plaintiff, Defendants maintained that none of the purportedly responsive, but not produced,

documents was responsive to Judge Go's Order.[7]  Id.

_____

material as the law requires with line redactions in attorney-task descriptions.  Docket No. 72 at
22:4-21; Docket No. 71.

[6] In an interrogatory response, Defendants have already identified for Plaintiff those documents
previously produced which refer to Plaintiff or any other managerial MES employee during the
date range for discoverable material.  Docket No. 72 at 2:25-3:2.

[7] For example, Plaintiff complains that Defendants have not produced 81, 83, 91, 170, 171, 198,
27, 332 and 363.  Docket No. 81.  Defendants respond that many of these are duplicates of
unredacted billing records already submitted.  Docket No. 82.  Insofar as the Court has seen the

### f.   Reassignment Of The Case To District Judge Chen And Magistrate Judge Scanlon

In light of this litigation's relationship to two other pending actions in the Eastern District—Safeco v. MES, et al., 09-CV-3312, and MES v. Liberty Mutual Surety Group, et al., 10-CV-2798—this case was reassigned to the District Judge Allyne Ross and me, who at the time were assigned to the 2009 and 2010 litigations.  District Judge Pamela Chen later replaced Allyne Ross as the presiding judge in this action and the related actions.

## II.   Legal Standards

When no written retainer agreement exists, "it is necessary to look to the words and actions of the parties to ascertain if an attorney-client relationship was formed."  C.K. Indus. Corp. v. C.M. Indus. Corp., 213 A.D.2d 846, 848 (3d Dep't 1995).[8]  "Certain factors are highly relevant in ascertaining whether an attorney-client relationship has been formed."  Kubin v. Miller, 801 F. Supp. 1101, 1115 (S.D.N.Y. 1992).  For example, "[a]n attorney's appearance in a

---

same duplication in the unredacted billing records already submitted for in camera review, Defendants need not submit the above-numbered documents that they certify as also duplicative.

In addition, Plaintiff complains that Defendants should have also given the Court the following documents for in camera review:  21, 59-61, 63-65, 94-97, 100, 129, 132-134, 145, 188, 193-194, 228-230, 397, 868-869, 871, 877-878, 915, 926-927, 931-933, 940, 943, 950 and 991.  Docket No. 81.  Defendants respond that they have reviewed the aforementioned documents and have determined that only one—Document 871—is actually responsive and therefore was omitted in error.  Id.  Defendants have submitted Document 871 to the Court and apologized for the oversight.  Id.  The Court is satisfied that, on the basis of Defendants' representation that they reviewed the documents and, in particular, Defendants' good faith correction, the other documents are not responsive to the set parameters, and Defendants need not submit any additional documents for in camera review.

[8] In order to have a legal malpractice claim under New York law, the plaintiff must demonstrate an attorney-client relationship.  See Huffner v. Ziff, Weiermiller, Hayden & Mustico, LLP, 55 A.D.3d 1009, 1011 (3d Dep't 2008).  This Court is not deciding in this Order whether Plaintiff and Defendants had an attorney-client relationship.  Nonetheless, in light of the fact that Plaintiff requests that this Court review privileged documents in camera to search for content relevant to an attorney-client relationship, it is helpful to state the relevant legal standard to guide that exercise.

judicial or quasi-judicial proceeding creates a presumption that the attorney-client relationship exists." Heine v. Colton, Hartnick, Yamin & Sheresky, 786 F. Supp. 360, 367 (S.D.N.Y. 1992). In addition, "regular communications relating to the subject matter of the representation as well as activity by the attorney and the client in furtherance of the objective of the retention" is relevant. In re Persaud, 467 B.R. 26, 40 (Bkrtcy. E.D.N.Y. 2012). "A current attorney-client relationship may also be reflected in the attorney's time and billing records." Id. "While it is not essential to the establishment of an attorney-client relationship that the client be billed or that a fee arrangement be made," when no retainer is paid or charged, and no bill submitted and no fee of any kind paid by the so-called client, "[s]uch facts give rise to a permissible inference that no such relationship existed," especially when the so-called client "makes no claim that services were to be gratuitously rendered." Young v. Oak Crest Park, Inc., 75 A.D. 2d 956, 957 (3d Dep't 1980). "Additionally, although the so-called client's subjective belief can be considered by the court, this belief is not sufficient to establish an attorney-client relationship." Kubin, 801 F. Supp. at 1115. "[F]or the purposes of a legal malpractice action, a constructive agreement or quasi contract of legal representation will not be implied absent proof of unjust enrichment." Heine, 786 F. Supp. at 366 (citing Hashemi v. Shack, 609 F. Supp. 391, 395 (D.C.N.Y. 1984) (defining "constructive agreements" and "quasi contracts" as contracts implied in law on the ground that they are dictated by reason and justice).

### III. Discussion

In conducting the reviews discussed below, I balanced Plaintiff's need for discovery supportive of his claim that an attorney-client relationship existed between Plaintiff and Defendants and Defendants' interest, on behalf of their client Safeco, to protect Safeco's privilege. Although a review of these documents might ordinarily be a review for relevance

alone, such a review here would vitiate Defendants' client's privilege. Many of the documents examined are relevant, in that they deal with the Safeco-MES dispute and show Defendants giving Safeco advice. Rather than consider simple relevancy, I have considered whether any of the reviewed documents support Plaintiff's position. Where the documents do not support Plaintiff's position and are privileged, Defendants need not produce them.

I do note that if Defendants intend to rely on any of these documents in their summary judgment motion or at trial, they must consider, inter alia, Safeco's position on the privilege, whether a limited waiver of privilege is possible, and whether the documents must be produced to Plaintiff before the summary judgment motion is made.

### a. Sixteen Documents Containing Unredacted Billing Records Regarding WTHF's Services Rendered To Safeco

As discussed above, "[w]hile it is not essential to the establishment of an attorney-client relationship that the client be billed or that a fee arrangement be made," when no retainer is paid or charged, and no bill submitted and no fee of any kind paid by the so-called client, "[s]uch facts give rise to a permissible inference that no such relationship existed," especially when the so-called client "makes no claim that services were to be gratuitously rendered." Young v. Oak Crest Park, Inc., 75 A.D. 2d 956, 957 (3d Dep't 1980). In this case, Plaintiff asked the Court to examine Defendants' unredacted billing records for evidence of an attorney-client relationship between Plaintiff and Defendants at least in part because, keeping the above standard in mind, Plaintiff lacks evidence of paid attorney's fees, i.e., the Parties lack a written fee arrangement regarding legal services provided by Defendants to Plaintiff, any bills from Defendants to Plaintiff for legal services, or evidence of Plaintiff ever paying Defendants for legal services.[9]

---

[9] Plaintiff's affidavit accompanying his motion to compel attempts to explain why Defendants never billed Plaintiff and why Plaintiff never paid Defendants. In brief, Plaintiff claims that

This Court has conducted an in camera review of Defendants' unredacted billing records at 78, 79, 82 (in large part the same as 78), 84 (same as 79), 98, 130, 142, 143 (same as 142), 173, 182, 184 (same as 182), 204, 268, 271, 310, and 331.[10]   None of these unredacted billing records contains any information supportive of Plaintiff's claim that there was an attorney-client relationship between Plaintiff and WTHF.   The billing records, it should be noted, were prepared and sent to Safeco on a regular basis from March 2008 through January 2009, which means that they were created contemporaneously with the provision of the legal services.[11]   See Cruz v. Local Union No. 3 of the Int'l Bd. of Elec. Workers, 34 F.3d 1148, 1160 (2d Cir. 1994).

The bills make limited references to MES.   The billing records issued towards the conclusion of that date range, nearer to January 2009, show that Defendants were not representing Plaintiff's interests because in that period Safeco, represented by Defendants, was preparing to sue Plaintiff for, inter alia, breach of contract in the related case Safeco v. MES, No. 09 Civ. 3312 (E.D.N.Y.).

_____

Plaintiff was supposed to be billed for Defendants' legal services through an unusual arrangement in which Safeco would forward the bills that it received from Defendants to Plaintiff.   Docket No. 70 ¶¶ 47-50.   On receiving Safeco's bill, Plaintiff was supposed to pay for all legal services allegedly performed to benefit MES, and all of Safeco's attorney's fees, but only if Safeco performed its obligations under the Indemnity Agreements to Plaintiff's satisfaction.   Id.   According to Plaintiff, the reason that Plaintiff never paid for any of Defendants' legal services (those that were performed to allegedly benefit MES or otherwise) is because Safeco never sent to Plaintiff unredacted billing records.   Id.

[10] Plaintiff complains that Defendants have not produced 81, 83, 91, 170, 171, 198, 27, 332 and 363.   Docket No. 81.   Defendants respond that many of these are duplicates of unredacted billing records already submitted.   Docket No. 82.   Insofar as the Court has seen the same duplication in the unredacted billing records already submitted for in camera review, Defendants need not submit the above-numbered documents that they certify as also duplicative.

[11] As an aside, the Court notes that there is some payment evidence attached to the unredacted billing records showing that Safeco paid Defendants in full for their legal services during certain months.   The Court did not see payment records for all relevant months during its in camera review.   This information further confirms that Safeco alone, not MES, had the attorney-client relationship with Defendants.

The billing records issued closer to March 2008 refer to MES from time to time. These billing records do not demonstrate the same antagonism between Safeco and MES as in 2009 when Safeco was on the brink of suing MES, but the more measured tone does not by itself translate into evidence supportive of Plaintiff's allegations that Defendants were jointly representing Safeco and MES. The Court makes two general observations about the billing records. First, at times they reflect meetings between Plaintiff, Safeco and Defendants. Plaintiff is already well aware of these meetings; Plaintiff refers to them in submissions to the Court. Second, other billing records mentioning MES reveal nothing that supports Plaintiff's claim that Defendants jointly represented Safeco and MES, or duped MES into believing that Defendants were jointly representing Safeco and MES.

Because of the subject matter of the Safeco relations with MES over the COE contracts, there are of course references to MES in the billing records; for example, the Parties agree that there was a possibility at some moment that Safeco would subcontract with MES as Safeco took over the COE contract(s), and that related negotiations took place. Plaintiff would no doubt argue that any billing record showing that MES so much as skittered across Defendants' minds is relevant evidence that Defendants were Plaintiff's lawyers. This Court disagrees. The point of the in camera review was to determine whether there was any relevant information on the specific question of the alleged attorney-client relationship between Plaintiff and Defendants. The Court looked for information supporting the existence of an attorney-client relationship or of a ruse perpetrated against Plaintiff regarding an attorney-client relationship between Plaintiff and Defendants. Evidence that Defendants thought about or had a communication with MES does not, without more, reflect an attorney-client relationship and is not relevant to supporting Plaintiff's claim. The documents are relevant to Defendants' position that there was no

14

relationship but as the documents are privileged, they need not be produced. See DiBella v. Hopkins, 403 F.3d 102, 120 (2d Cir. 2005) ("Time records and billing statements that are 'detailed in showing services, conversations, and conferences between counsel and others" to such an extent that "to allow access to [the] material would disclose . . . trial strategy, and reveal the . . . legal work that has been done by [the party's attorneys]' are privileged in New York.") (citing Licensing Corp. of Am. v. Nat'l Hockey League Players Ass'n, 153 Misc. 2d 126, 138 (N.Y. Sup. Ct. 1992)).

In light of the foregoing, this Court finds as a result of its in camera review of the unredacted billing records that the Defendants' billing records do not demonstrate any information supportive of Plaintiff's claim of Defendants' alleged joint representation of Safeco and MES both. Given that finding, this Court need not consider whether Plaintiff could successfully argue for any kind of abrogation of Safeco's privilege.

> **b. Twenty-Five Privileged Documents That In Any Way Refer To Communications Between Defendants, Safeco And Plaintiff Or Other MES Managerial Employee**

There are twenty-five privileged documents before the Court for in camera review that refer in some way to Defendants' specific communications with Mr. Makhoul or any managerial level MES employee. These privileged documents were ordered subject to an in camera review by Magistrate Judge Go because, despite Defendants' assertion of privilege, the Court determined that an in camera review of the documents was the best way to satisfy Plaintiff and the Court that Defendants did not invoke privilege in order to hide evidence that might support a conclusion that there was an attorney-client relationship between Plaintiff and Defendants. Magistrate Judge Go commented that "Judge Gleeson has expressed skepticism about the validity of Mr. Makhoul's claims. I can't say that I am necessarily in disagreement with him, but

. . . I think the easiest way to deal with this issue . . . [is that Defendants will] produce the documents that in any way refer to . . . specific communications with Mr. Makhoul or an employee of MES and I'll take a look at them and see if they have bearing on the claims in this case.  Period." Docket No. 72 at 8:19-9:2.

These documents are marked with the following document numbers on Defendants' January 7, 2013 privilege log (updated as of February 4, 2013): 27, 42, 43, 47, 219, 220, 221, 224, 302, 306, 404, 414, 856, 871, 907, 908, 911, 919, 936, 955, 958, 968, 979, 990 and 995. This Court has reviewed each of these documents with the aid of Defendants' name index.

Having reviewed the aforementioned privileged documents in camera from Defendants, this Court finds that none of them is supportive of Plaintiff's claim that Plaintiff and Defendants had an attorney-client relationship.  Document numbers 27, 42, 43 and 47 (a duplicate of 43) are emails, some with attachments, mentioning Plaintiff in the context of Safeco's takeover of contracts.[12]  Again, the Parties do not dispute that Safeco and MES negotiated with respect to the contract takeovers.  None of these documents reveals anything relevant regarding Plaintiff's position that he had an attorney-client relationship with Defendants.  They do not show Defendants consulting with Plaintiff, providing advice to Plaintiff, negotiating on Plaintiff's behalf with the COE, or taking any other action that would support the conclusion that WTHF was Plaintiff's attorney.   I briefly describe why the documents are not relevant.

Document numbers 219, 220, 221, and 224 are all related.  Document 224 is the initial email sent from Safeco's in-house counsel to Safeco's in-house and outside counsel regarding Defendants' input on a draft email to MES, and documents 219, 220, and 221 reflect subsequent

---

[12] Defendants' privilege log frequently notes when a document has already been ruled privilege in a related case.  This is irrelevant to the immediate task, which is to determine whether the substance of a privileged document has any bearing on Plaintiff's claim in this case.

responses.  The Court finds that the content of these documents contains nothing that supports

Plaintiff's position that he or MES had an attorney-client relationship with Defendants; if

anything, the documents support the opposite view because they specifically refrain from

providing advice to Plaintiff or revealing privileged material to Plaintiff.[13]

Document 302 is an email from outside counsel circulating a letter draft destined for

Plaintiff to in-house counsel and other outside counsel seeking advice as to its content.  The

substance does not support Plaintiff's position that he had an attorney-client relationship with

Defendants, and again, supports the opposite view because it invites Plaintiff to involve his own

counsel.

Documents 306, 404 and 955 are emails from Safeco in-house counsel to other Safeco

counsel forwarding an email or email chain from Plaintiff or Hirani with comment.  The content

does not show an attorney-client relationship between Plaintiff and Defendants, but rather, it

shows Defendants considering Safeco's position in the contract negotiations as separate and

apart from Plaintiff's concerns.

Document 414 contains the handwritten notes of a non-testifying expert attorney during a

meeting attended by Plaintiff.  These notes do not reveal information tending to show an

attorney-client relationship between Plaintiff and Defendants.  Rather, they show an adversarial

relationship between Plaintiff and Safeco as Safeco attempts to analyze Plaintiff's arguments.

Document 856 contains ninety-four pages of Safeco's outside counsel's personal

handwritten notes relating to telephone conferences and meetings from March 27, 2008 through

---

[13] Evidence such as this, i.e., that an attorney-client relationship did not exist, supports
Defendants' position in this action.  As for Plaintiff, he has not shown that the Court should
pierce the privilege protecting Documents 219, 220, 221 and 224 by showing a "substantial
need" for them "to prepare [his] case," in part because the documents do not support Plaintiff's
theory of the case.  Fed. R. Civ. P. 26(b)(3).

November 21, 2008 that either involved Plaintiff or referenced Plaintiff.  Documents 871, 907, 908, 911, 919, 990 and 995 are many pages of privileged handwritten notes taken by Safeco outside counsel during meetings or telephone conferences.  As with Document 856, these documents do not shed light on whether Plaintiff and Defendants had an attorney-client relationship.  This Court has reviewed the handwritten notes and has found that they do not support Plaintiff's position as to whether Plaintiff and Defendants had an attorney-client relationship.  Defendants' privilege log reveals that many of these pages deal with Safeco's proposed takeover of the COE contracts, and as Plaintiff should anticipate given Plaintiff's participation on the calls, the content of the handwritten notes reveals negotiation between Safeco and Plaintiff regarding Plaintiff as a subcontractor on the takeover.  These documents show an early coordinated response between Safeco and MES but do not show an alignment of interests or Defendants acting on Plaintiff's behalf.

Documents 936, 958, 968 and 979 are communications between Safeco (or Safeco's agents) and Plaintiff that Plaintiff either already has in his possession or that have already been produced in discovery, with handwritten notes made on a hard copy by Safeco's outside counsel. The Court has reviewed the handwritten notes and finds that they are irrelevant to the question of whether Plaintiff and WTHF have an attorney-client relationship, and at times are merely largely underlines or circles of specific text.

None of these documents supports the claim that Plaintiff and Defendants had an attorney-client relationship; all are privileged, and none need to be produced.

### c.  Twenty Documents Chosen By Plaintiff For <u>In Camera</u> Review

The group of twenty documents were specifically chosen by Plaintiff to serve as a sample from the entire universe of documents he challenged from Defendants' privilege log.  These

documents appear on Defendants' January 7, 2013 privilege log (updated as of February 4, 2013) with the following document numbers:  17, 20, 26, 28, 77, 108, 123, 152, 213, 255, 283, 346, 858, 863, 864, 866, 874, 920, 959 and 972.

### i.  Documents Chosen By Plaintiff That Fall Outside The Scope Of Discovery

As mentioned above, Magistrate Judge Go sent strict date ranges within which Plaintiff was permitted to discovery documents, a limitation that obviously governs the permissible scope of this in camera review.  These date ranges were: (1) Pyro Project documents dating from March 24, 2008 to July 2008; (2) HEPFF Project documents dating from August 2008 to November 4, 2008; (3) ERDLF Project documents dating from September 2008 to January 16, 2009; and (4) Department of Labor documents dating from January 2009 to April 28, 2009. Docket No. 64 at 2.  Magistrate Judge Go alluded to these date ranges again in the same Order in which she invited Plaintiff to select twenty documents for in camera review, and additionally stated that the in camera review will "not include drafts of agreements that [D]efendants transmitted to Safeco."  Docket No. 71.

It is therefore somewhat surprising that Plaintiff, despite the relatively few restrictions he faced in terms of date ranges and subject matter of documents, has selected documents for in camera review that breach these limitations.  As Magistrate Judge Go explained, this action may not be used to conduct discovery in related but separate actions.  To the extent that Plaintiff asks this Court to conduct in camera review on documents that violated Magistrate Judge Go's date range and subject limitations, the request is inappropriate.  The documents selected by Plaintiff for in camera review which impermissibly fall outside of Magistrate Judge Go's date range and subject limitations are as follows: 108, 213, 283, 346, 864, 866, and 920.  For example, according to Safeco's privilege log, Document 108 is a draft letter destined for Plaintiff

19

regarding the collateral security and indemnification on the Pyro Project.  The document is dated

August 15, 2008.  Magistrate Judge Go set the end date for discovery relating to the Pyro Project

in this action as July 2008.  Docket No. 64.  Nonetheless, to expedite discovery, I have looked at

this document and found that it is not supportive of Plaintiff's attorney-client relationship

allegation.

Next, according to Safeco's privilege log, Documents 213 and 283[14] both deal with the

HEPFF Project and are dated January 8, 2009 and February 11, 2009, respectively.  Magistrate

Judge Go's date range for HEPFF Project discovery ended on November 4, 2008.  The Court has

nonetheless looked at these documents and determined that they do not support that an attorney-

client relationship existed between Plaintiff and Defendants.

Document 346 is outside of Magistrate Judge Go's date range.  Document 346 deals with

Safeco and MES's dispute over the three contracts.  The latest date of permissible discovery

relating to the three contracts, however, is January 2009, and Document 346 is dated March

2009.  The Court finds that the content of this document is irrelevant to the existence of an

attorney-client relationship between Plaintiff and Defendants.[15]

Documents 864, 866 and 920 are all labeled on Defendants' privilege log as exhibits to a

draft takeover agreement sent to Safeco by Defendants or a non-testifying expert.  Given that

---

[14] The first email in this email chain does not appear to be privileged.

[15] This document does not appear to be privileged.  The first email in the three-email chain
appears largely factual despite being sent by Safeco's in-house counsel to a Liberty Mutual
employee.  See Fed. Housing Fin. Agency v. UBS Americas Inc., 2013 WL 1700923, at *2
(S.D.N.Y. Apr. 16, 2013) ("Even if it is true . . . that the memoranda at issue were created for the
predominant purpose of rendering legal advice, that does not relieve the [party claiming
privilege] of the obligation to show that the entirety of each document is privileged.").  It also
does not appear that any of the correspondents on the last email of the chain are lawyers such
that the writer is doing anything more than seeking advice from a non-lawyer as to the latter's
preferred next steps.

Magistrate Judge Go told Plaintiff that his discovery could not include drafts of agreements sent to Safeco, Plaintiff is not entitled to in camera review on Documents 864, 866 and 920. Docket No. 71. The Court has regardless reviewed the documents and finds that they do not support the view that there is an attorney-client relationship.

### ii. Documents Chosen By Plaintiff That Fall Within The Scope Of Discovery

The documents selected by Plaintiff for in camera review that do not fall outside the date range of discoverable material set by Magistrate Judge Go, or her limitation that drafts of agreements that Defendants sent to Safeco are not discoverable, are the following document numbers: 17, 20, 26, 28, 77, 123, 152, 255, 858, 863, 874, 959 and 972. Docket No. 64 at 2.

Document 17 is an email chain which which is not relevant to whether an attorney-client relationship exists between Plaintiff and Defendants. The Court ruled this email privileged in a related case, stating that it is a communication between "attorneys and the clients . . . and their retained experts about the scope of the claims that . . . they may have against or may be sued for in connection with the work." Safeco v. MES, No. 09 Civ. 3312 (E.D.N.Y.), Docket No. 234 at 169. The fact that this Court has already ruled on Document 17 in one of the related cases involving Plaintiff highlights the Court's concern with the Plaintiff's duplicative discovery requests in this case as an approach that amounts to a second attempt to gain a different discovery ruling than that made in another case.

Document 20 is an email chain which is partially protected by the attorney-client privilege between Safeco's non-testifying expert from Cashin Spinelli, in-house counsel and outside counsel. In the email chain, counsel provides analysis of Safeco's position on the COE contract and discusses gathering materials for Safeco's position. It is not supportive of whether there was an attorney-client relationship between Plaintiff and Defendants. The Court's in

21

camera review of Document 20 reveals that it contains some factual content, which again, the Court has already ruled upon, ordering redacted production, in related case 09 Civ. 3312 (E.D.N.Y.), Docket No. 235 at 38-39.  Defendants represented to Plaintiff that they have already produced a redacted version of this document.

Document 26 is an email sent by Safeco's non-testifying expert communicating previously requested data to Safeco's in-house and outside counsel in response to one of the lawyer's earlier requests.  See Geller v. N. Shore Long Island Jewish Health Sys., No. 10 Civ. 170, 2011 WL 5507572, at *2-4 (E.D.N.Y. Nov. 9, 2011) (finding that a compliance officer conducting an investigation was acting as an agent of counsel and, therefore, the investigative product was protected by both attorney-client privilege and work product doctrine).  Defendants observe that the attachment was already produced in discovery, which the Court views as proper insofar as the attachment's content is largely factual.  The email summarizes views as to specific aspects of the COE projects for the expert's review.  The cover email is not relevant to whether Plaintiff and Defendants had an attorney-client relationship.

Document 28 is an email chain between a Safeco principal, in-house counsel, outside counsel, and a non-testifying expert and another Safeco in-house counsel sharing edits on a draft document.  The documents confirm Safeco's position as to an aspect of the COE contracts. Document 28 does not support the position that Plaintiff and Defendants had an attorney-client relationship.

Document 77 is an email chain regarding ASBCA rule compliance and does not support that Plaintiff and Defendants had an attorney-client relationship.  The document shows Safeco in an adversarial position to Plaintiff before the ASBCA.

Document 123 begins with an email from Hirani, who collaborated with Plaintiff in the

HMES venture, to Safeco's Ann Hester (who does not appear on the name index).  Hirani's

presence on the initial email renders at least that communication non-privileged.  Hester

forwarded the email to Safeco in-house counsel, with a copy to Safeco's outside counsel, seeking

their advice.  The Safeco in-house counsel then offered his advice to another Safeco in-house

counsel and outside counsel.  Insofar as the last email on the chain discussed a simple scheduling

detail, that scheduling detail is not privileged, and Safeco must produce a redacted version of this

document for that reason as well.  See Koumoulis v. Ind. Fin. Mktg. Grp., Inc., 295 F.R.D. 28,

46 (E.D.N.Y. 2013) ("Communications about scheduling are not privileged.").  As with other

documents, this one shows Safeco in an adversarial position to Plaintiff and Hirani, particularly

with regard to strategy.  The content of Document 123 is irrelevant to whether an attorney-client

relationship existed.

Document 152, which is a draft letter of understanding made by Safeco's attorneys to

protect Safeco's interests on a draft letter of understanding seeking to define Safeco's legal

obligations, is not relevant to an attorney-client relationship.

Document 255 was created in anticipation of a telephone conference to serve as an

agenda for the conversation.  Although the document records some coordination with MES for

the takeover proposal, it clearly addresses Safeco's legal interests as adverse to those of MES.

The content does not support a conclusion of an attorney-client relationship between Defendants

and Plaintiff.

Documents 858, 863, 874 and 972, which are Safeco's outside counsel's handwritten

notes, prepared for or taken during various meetings and phone calls (the dates of which Plaintiff

can find on Defendants' privilege log), do not support that Plaintiff and Defendants shared an

attorney-client relationship.[16]  Again, the notes contain information that shows a difference between Safeco's legal interests and those of MES, particularly if the COE did not want Plaintiff involved in the takeover.

Document 959 is an email chain with Safeco's outside counsel's handwritten notes on top of a hard copy.  The Court does not see how the content of this document supports the idea that Plaintiff and Defendants had an attorney-client relationship.[17]

## IV.    Conclusion

In sum, this Court has found no relevant evidence showing an attorney-client relationship between Plaintiff and Defendants during its in camera review of the unredacted billing records, twenty-five privileged documents that in any way refer to communications between Defendants, Safeco and Plaintiff or other MES managerial employees, and twenty documents selected by Plaintiff to stand as representative rulings.

Along the way, the Court has found some documents which are not wholly or partially privileged as claimed, and Defendants must revisit the documents for which the Court had questions and review them for production.  These documents are Documents 20, 26, 123, 283,

---

[16] However, Defendants should revisit Document 858 to determine if there is any produceable material.  Safeco's outside counsel handwrites his mental impressions over a handwritten agenda of the meeting.  The mental impressions written over the agenda are privileged to the extent they were "made for the purpose of facilitating the rendition of legal advice or services," and it appears to the Court that these handwritten notes largely meet that definition.  GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., No. 11 Civ. 1299 (HB) (FM), 2011 WL 5439046, at *9 (S.D.N.Y. Nov. 10, 2011).  However, if the handwritten agenda of the meeting in Document 858 is factual in terms of what Safeco, Defendants and the COE agreed would guide their conversation (and there is insufficient explanation to make clear to the Court whether this is the case), then Defendants may have to produce the material.  In sum, Defendants should revisit these documents and either confirm to the Court why that underlying handwritten agenda does in fact reflect the attorney's mental impressions, or redact Document 858 to reflect what is factual in nature and what is an attorney's mental impressions.

[17] The Court notes that the first email on the chain is not privileged and should be produced if it has not already been.

346, 858 and 959.  Defendants should keep in mind that they need not produce documents falling outside of the date and subject parameters set by Magistrate Judge Go, but in cases where the Court commented on the claimed privilege in such documents, Defendants should apply the analysis to documents within Magistrate Judge Go's discovery parameters.

On or before April 2, 2014, Defendants must revise their privilege log and make an additional production to Plaintiff.  On or before April 2, 2014, Defendants must file a status report confirming that they have complied with this Order.

On receipt of Defendants' status report, the Court will set a telephone conference in order to establish a cross-summary judgment briefing schedule on the question of the existence of an attorney-client relationship.  Plaintiff has indicated some desire to conduct depositions and Magistrate Judge Go was considering whether to allow such discovery.  I will discuss the deposition issue with the Parties during the telephone conference, as well as any other outstanding discovery issues.  The Parties should expect to conclude discovery in the near future. As mentioned above, District Judge Gleeson stated in April 2012 that he believed that the question of whether an attorney-client relationship existed between Plaintiff and Defendants could be ripe for cross-summary judgment motions with just supporting affidavits from the Parties.  Today, 35,511 additional pages of documents, 19 interrogatory responses, and 76 answers to requests for admission later, Plaintiff has been afforded extremely generous discovery beyond those anticipated affidavits.

SO ORDERED.

Dated:  Brooklyn, New York
        March 12, 2014

                                         *Vera M. Scanlon*
                                         VERA M. SCANLON
                                         United States Magistrate Judge