UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
GEORGE MAKHOUL, Individually and as Successor
in Interest to M.E.S., INC.,

**MEMORANDUM AND ORDER**
11-CV-5108 (PKC)

Plaintiff,

-against-

WATT, TIEDER, HOFFAR & FITZGERALD, LLP,
MARK SGARLATA, an individual, CHRISTOPHER
BRASCO, an individual, VIVIAN KATSANTONIS,
an individual, and CHRISTOPHER ANZIDEI, an
individual,

Defendants.
------------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Plaintiffs George Makhoul, individually and in his capacity as successor-in-interest to M.E.S., Inc. (collectively, "Plaintiffs"), bring suit against Watt, Tieder, Hoffar, & Fitzgerald, LLP, and its individual partners (collectively, "WTH&F"). The complaint alleges that WTH&F was jointly representing both its own client, Safeco Insurance Company of America, and Plaintiffs in negotiations with the U.S. Army Corps of Engineers ("COE") following MES's default terminations on three federally-funded projects bonded by Safeco. Premised upon the alleged existence of an attorney-client relationship between Plaintiffs and Defendants, Plaintiffs assert claims for legal malpractice, breach of fiduciary duty and a duty of care to Plaintiff, tortious interference with contract, and unjust enrichment. For the reasons discussed herein, Defendants' motion for summary judgment is granted in its entirety.[1]

---

[1] Given the Court's finding that there was no attorney-client relationship between Plaintiffs and WTH&F, as set forth *infra*, the Court declines to resolve the issue of Plaintiff Makhoul's standing to bring the claims in this action. *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Mem."), dated 11/13/14, at 8–10. (Dkt. 106.)

BACKGROUND

A. Parties

M.E.S., Inc. ("MES") is a New York corporation. (Def. 56.1[2] ¶ 1.) Makhoul claims he is the president, sole officer and sole shareholder of MES. (Pl. Opp.[3] at 3.) HMES is a New Jersey partnership formed by MES and Hirani Engineering and Land Surveying, PC ("Hirani"). (Pl. 56.1(b) ¶ 2.) HMES was formed in 2003 for the sole purpose of bidding on the High Energy Propellant Formulation Facility at Picatinny Arsenal contract (the "HEPFF Project") with the COE. (*Id.* ¶ 3.) Safeco Insurance Company of America ("Safeco") is organized under the laws of the State of Washington with its principal place of business, for purposes of the three COE projects, in the State of New Jersey.[4] WTH&F is a law firm, operating as a Virginia limited liability partnership, with its principal place of business in Virginia. (Def. 56.1 ¶ 2.)

B. Relationship between Safeco and Makhoul

Makhoul personally executed two indemnity agreements in favor of Safeco on or about February 3, 2002 and June 23, 2003 for the following three federally-funded projects bonded by Safeco: (i) Contract No. W912DS-06-0023, awarded September 29, 2006, for a Pyrotechnics Research and Technology Facility at Picatinny Arsenal in Dover, New Jersey between COE and MES (the "Pyro Project"); (ii) Contract No. DACA5I-03-C-0024, awarded September 19, 2003, for the HEPFF Project at Picatinny Arsenal in Dover, New Jersey between COE and HMES;

---

[2] Citations to "Def. 56.1" refer to Defendants' Statement of Material Facts pursuant to Local Rule 56.1. (Dkt. 107.) Citations to "Pl. 56.1" refer to Plaintiffs' Response to Defendants' 56.1 Statement of Material Facts. (Dkt. 113.) Citations to "Pl. 56.1(b)" refer to Plaintiffs' Statement of Additional Facts. (*Id.*)

[3] Citations to "Pl. Opp." refer to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, filed 1/16/15. (Dkt. 114.)

[4] *M.E.S., Inc. et al v. Liberty Mutual Surety Group et al.*, 10 Civ. 02798 (E.D.N.Y.) (PKC) (VMS), at Dkt. 1, ¶ 7.

and, (iii) Contract No. W912DS-05-C-0006, awarded February 11, 2005, for an Explosive Research and Development Loading Facility at Picatinny Arsenal in Dover, New Jersey between COE and MES (the "ERDLF Project"). (*Id.* ¶ 3.) The two indemnity agreements contractually obligated Plaintiffs to indemnify Safeco for any losses it incurred in fulfilling Plaintiff's obligations under the three projects. (*Id.* ¶ 7.)

Based on the COE's determination that MES and HMES had defaulted in their contractual obligations on each of the three projects, the COE issued formal cure notices to MES and HMES, as well as Safeco, by letters dated March 5, 2008, November 4, 2008, and December 22, 2008. (Exs. 10–12, 13, 15, 16 to Def. Mem.) Following its issuance of the default notices, the COE issued demands on Safeco to complete the projects pursuant to Safeco's obligations under the Performance and Payment Bonds, stating that "[t]he Government expects Safeco to fulfill its obligations as surety in this case." (Exs. 17–19 to Def. Mem.)

In or about March 20, 2008, Safeco hired WTH&F as outside counsel to advise and represent Safeco in responding to the Bond Demand Letters on the Pyro, HEPFF and ERDLF Projects. (Def. 56.1 ¶ 21.)

**C. March 26, 2008 Meeting**

Plaintiffs allege that on March 26, 2008, Safeco met with Plaintiffs and WTH&F to "discuss the default, project status and a path forward." (Pl. Opp. at 5.) Plaintiffs claim that during this meeting, Defendants advised Makhoul that it could "simultaneously represent Safeco and Plaintiffs in connection with the takeover and completion of the Pyro [P]roject and any related negotiations with the COE." (*Id.*) Plaintiffs argue that Defendant Mark Sgarlata, a WTH&F attorney, assured Makhoul that it was "in his and MES's best interest to work with Safeco toward an amicable completion of the work." (*Id.*) In contrast, WTH&F asserts that it

3

never made any representations to Plaintiffs, verbal or otherwise, that it would represent both Plaintiffs and Safeco. (Def. Mem. at 10–11.) The parties agree that there is no written retainer agreement, letter of engagement, or other document or written communication indicating that Plaintiffs retained WTH&F as their counsel. (Pl. Opp at 11–12; Def. Mem. at 11–13.) However, Plaintiffs claim that a verbal retainer was agreed to during the March 26, 2008 meeting. (Pl. Opp. at 5.)

According to Plaintiffs, Defendants thereafter represented both Plaintiffs and Safeco in connection with the Pyro Project takeover process. (*Id.*) Plaintiffs claim that between March 26, 2008 and January 2009, MES relied exclusively on Defendants for advice and representation in all negotiations that MES had with the COE.[5] (*Id.*) Plaintiffs allege that it had more than twelve meetings with Defendants, without the presence of any other attorney representing Plaintiffs' interests. (*Id*. at 6.) Plaintiffs state that as part of this representation, MES relied upon Defendants for the preparation of written agreements with the COE, which Defendants negotiated on behalf of both Safeco and MES. (*Id.* at 5.)

WTH&F claims that it attended meetings regarding the three COE projects on behalf of Safeco only. (Def. 56.1 ¶ 23.)

**D. Plaintiffs' Legal Representation**

Zawisny & Zawisny P.C. represented Plaintiffs for several years in connection with reviewing and negotiating agreements between Plaintiffs and their subcontractors, reviewing claim analyses, defending claims, reviewing important correspondence and mitigating disputes between Plaintiffs and its subcontractors. (Pl. 56.1(b) ¶ 16.) In addition, Michael H. Payne and

---

[5] Notably, although Plaintiffs' complaint alleges malpractice by WTH&F between March 2008 and April 2009, during oral argument on Defendants' motion, Plaintiffs shortened the period of alleged representation to continuing only through January 2009.

Timothy Sullivan of Payne, Hackenbracht and Sullivan ("PHS") provided legal assistance to Plaintiffs with respect to their claims in connection with federal projects performed by Plaintiffs for the COE, including Plaintiffs' claims relating to the projects at issue in this litigation.[6] (*Id.* ¶¶ 19, 21). Plaintiffs do not dispute that it was represented by several non-WTH&F attorneys on various matters. (Pl. 56.1 ¶ 33.) However, Plaintiffs argue that these attorneys did not represent them in their negotiations with the COE between March 2008 and January 2009. (*Id.*)

*ANALYSIS*

### I. Summary Judgement Standard

The standard for summary judgment is well-established. Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986). "The moving party bears the burden of establishing the absence of any genuine issue of material fact," *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010); *see Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006), after which the burden shifts to the non-moving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011); *see also F.D.I.C. v. Great American Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

---

[6] Sullivan, who was primarily responsible for attending to these claims, passed away in 2009, and Payne assumed control of the prosecution of Plaintiffs' claims. PHS thereafter merged with Cohen, Seglias, Pallas, Greenhall and Furman ("Cohen Seglias"). (Pl. 56.1(b) ¶ 19). According to Plaintiffs, Cohen Seglias continued to represent Plaintiffs on matters distinct and different from those at issue in this case. (*Id.* ¶ 19.)

5

The non-moving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 167 (2d Cir. 2009) (internal quotations and citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 247; *see also Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56–57 (2d Cir. 2012); *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005). The non-moving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation," *Jeffreys*, 426 F.3d at 554 (quotations and citations omitted); *see also DeFabio v. East Hampton Union Free Sch. Dist.*, 623 F.3d 71, 81 (2d Cir. 2010); and must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner v. Clinton Cnty.*, 541 F.3d 464, 471 (2d Cir. 2008). In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## II. Legal Malpractice Claim

In a diversity action based on attorney malpractice, state substantive law – here, that of New York – applies. *Rubens v. Mason*, 527 F.3d 252, 254 (2d Cir. 2008). In order to sustain a legal malpractice claim, a plaintiff must show: (1) the existence of an attorney-client relationship; (2) negligence; (3) proximate cause; and (4) actual damages. *M.J. Woods, Inc. v. Conopco, Inc*., 271 F. Supp. 2d 576, 583 (S.D.N.Y. Jul. 14, 2003).

Courts in this jurisdiction consider six factors to determine whether an attorney-client relationship exists, though no one factor is dispositive:

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of the litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

*Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 210 (S.D.N.Y. Sept. 17, 2009). Each of the relevant factors is discussed below.[7]

**1. There Is No Evidence of a Fee Arrangement**

In this case, there is no evidence of a fee arrangement between Plaintiffs and WTH&F. There are no documents reflecting any such arrangement, nor cancelled checks reflecting payments to WTH&F from Plaintiffs. Indeed, it is undisputed that all of WTH&F's bills were sent to Safeco's outside billing company and that Safeco paid all of WTH&F's fees and invoices, with no contribution from Plaintiffs. (Pl. 56.1 ¶¶ 28–29; Exs. 20, 24 to Def. Mem.)

In the face of this uncontroverted evidence, Plaintiffs argue that a fee arrangement nonetheless existed between Plaintiffs and WTH&F by virtue of Plaintiffs' obligation to indemnify Safeco for any costs, such as legal fees, it incurred as a result of Plaintiffs' default on the COE contracts. (Pl. Opp. at 10.) However, Plaintiffs' duty to reimburse Safeco for *its* legal fees does not qualify as a fee arrangement between WTH&F and *Plaintiffs,* nor does it constitute actual payment of WTH&F's fees, for purposes of determining whether an attorney-client

---

[7] Plaintiffs concede that the third factor is not applicable here. (Pl. Opp. at 10.)

relationship existed between Plaintiffs and WTH&F. Plaintiffs cite no authority for this contorted conclusion, nor has the Court found any.

### 2. There is No Evidence of Any Retainer or Contract with Plaintiffs

The parties agree that there is no written retainer agreement, letter of engagement, or other document indicating that Plaintiffs retained WTH&F as their counsel. (Pl. 56.1 ¶ 26.) However, Plaintiffs argue that a verbal retainer was reached during the March 26, 2008 meeting. (*Id.*) Plaintiffs' sole evidence to support this claim is Makhoul's plainly self-serving affidavit[8] in which he asserts that, "[a]t that meeting on March 26, 2008, I was persuaded by Safeco and WTH&F to allow WTH&F to represent MES'[s] interests against the COE in connection with all negotiations for the Picatinny Projects." (Makhoul Aff.[9] ¶ 26.) However, it is well-settled that one party's unilateral, subjective belief that he was a client is not sufficient to establish an attorney-client relationship. *See Kubin v. Miller*, 801 F.Supp. 1101, 1115 (S.D.N.Y. Jul. 31, 1992) ("[A]lthough the so-called client's subjective belief can be considered by the court . . . this

---

[8] While it is not the Court's role to assess the credibility of parties or witnesses at the summary judgment stage, *see*, *e.g.*, *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006), "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Put differently, "where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys*, 426 F.3d at 554. Here, in addition to the evidence contradicting Makhoul's affidavit, the Court has other grounds for questioning the veracity of his statements based on evidence adduced in connection with related litigation before the Court. *See Safeco Insurance Company of America v. M.E.S., Inc et al.*, 09 Civ. 03312 (E.D.N.Y.) (PKC) (VMS), at Dkt. 313, p. 17-18 (Magistrate Judge's finding that Makhoul was not credible with respect to his denial of MES having an interest in a company founded by Makhoul's brother and Makhoul's friend, to which MES paid approximately $300,000 for a purported four-year lease soon after the Court imposed monetary sanctions on MES).

[9] Citations to "Makhoul Aff." refer to the Affidavit of George Makhoul in Opposition to Defendants' Summary Judgment Motion, filed 1/16/15. (Dkt. 114–1.)

belief is not sufficient to establish an attorney-client relationship.")); *see Stratavest Ltd. v. Rogers*, 903 F.Supp. 663, 667 (S.D.N.Y. Nov. 16, 1995) (citing *Kubin*); *Volpe v. Canfield*, 654 N.Y.S.2d 160, 162 (2d Dep't 1997) ("A plaintiff's unilateral belief does not confer upon him the status of client."). This factor, therefore, provides little, if any, support for Plaintiffs' position, and is substantially outweighed by all of the other relevant factors.

### 3. There is No Evidence that WTH&F Actually Represented Plaintiffs In One Aspect of the Matter

Plaintiffs concede that WTH&F "never formally appeared on behalf of Plaintiff[s] in any litigation", but nonetheless argue that they *believed* that WTH&F's words and actions created an attorney-client relationship. (Pl. Opp. at 13.) However, Plaintiffs fail to cite any pleading or communication in which WTH&F held itself out as MES's counsel. Rather, based largely on Makhoul's affidavit, Plaintiffs claim that: (1) they met with WTH&F on several occasions to discuss a "multitude of issues regarding various defaults, project completion strategies, how to respond to COE demands, as well as the terms and conditions of the MOU [Memorandum of Understanding]" with the COE (*id.* at 14); (2) WTH&F attended meetings at which both Safeco and MES were present and participated; and (3) Plaintiffs shared project documents with WTH&F. (Makhoul Aff. ¶¶ 29–31, 34.) Even assuming the truth of these representations, the Court does not find that they constitute evidence of actual representation of Plaintiffs by WTH&F. Mere participation in meetings with WTH&F and Safeco, and sharing project documents with WTH&F – as Plaintiffs were required to do under the indemnity agreement – is ambiguous conduct at best and, if anything, is more consistent with the contractual indemnitor-indemnitee relationship that existed between Safeco and Plaintiffs than a purported, un-memorialized attorney-client relationship between Plaintiffs and WTH&F, who were clearly retained by Safeco. This factor thus also weighs in favor of Defendants.

4. **Plaintiffs Themselves Allege that WTH&F Excluded Plaintiffs from the Negotiations with the COE in order to Protect Safeco**

Although Plaintiffs contend that the fifth factor is not applicable, their complaint alleges that WTH&F represented Safeco to MES's exclusion in its dealings with the COE and that WTH&F was loyal to Safeco, but not to Plaintiffs. (Def. Reply[10] at 11; Compl. ¶¶ 29, 35–39.) While Plaintiffs claim that this conduct is evidence of WTH&F's *breach* of an attorney-client relationship with Plaintiffs, it has obvious relevance in determining whether such a relationship ever existed. Thus, based on Plaintiffs' own allegations, the Court finds not only that the fifth factor applies to this case, but that it weighs against a finding of an attorney-client relationship between Plaintiffs and WTH&F.

5. **Plaintiffs Did Not Have a Reasonable Belief That They Were Represented by WTH&F**

Plaintiffs claim that they reasonably believed that they had an attorney-client relationship with WTH&F between March 2008 and April 2009.[11] (Compl. ¶¶ 20, 165.) The documentary evidence, however, belies Plaintiffs' claim that they held any such belief, whether reasonable or not. Plaintiffs' communications with their own attorneys contradict the claim that Plaintiffs viewed WTH&F as their attorneys with respect to the COE projects.[12] Furthermore, the

---

[10] Citations to "Def. Reply" refer to Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment, dated 3/6/15. (Dkt. 109.)

[11] As previously noted, although Plaintiffs originally alleged malpractice by WTH&F between March 2008 and April 2009, during oral argument on Defendants' motion, Plaintiffs shortened the period of WTH&F's alleged representation to January 2009.

[12] Examples of communications between Plaintiffs and their own, separate legal counsel include: (1) on 4/11/08, MES's counsel, Timothy Sullivan, filed multiple appeals on MES's claims against COE (Ex. 37 to Def. Mem.); (2) on 6/11/08, MES provided Safeco with two complaints filed against COE by Sullivan (Ex. 38 to Def. Mem.); (3) on 2/27/09, an email between MES,

correspondence between Safeco and Plaintiffs indicate that Safeco repeatedly advised MES that Safeco was represented by WTH&F, and requested that Plaintiffs engage their own counsel several times during the alleged period of joint representation.[13] In fact, there is evidence that Plaintiffs acknowledged that WTH&F represented Safeco, and not MES. For example, in a letter Plaintiffs sent to Safeco on or about July 28, 2009, they stated: "*Since March 2008*, MES has

---

Sullivan, and the COE discussed recent settlement negotiations involving terminations and claims on all three projects (Ex. 48 to Def. Mem.); (4) on 3/3/09, MES advised Safeco that its counsel, Michael Payne, was continuing settlement negotiations involving terminations and claims on all three projects (Ex. 49 to Def. Mem.); (5) Plaintiffs identified Payne as MES's attorney in two separate emails on 3/19/09 and 3/24/09 to Caryn Mohan-Maxfield, Esq./Safeco (Ex. 50 to Def. Mem.); and (6) on 4/6/09, MES's attorney, Mark Zawisny, filed another lawsuit against Hirani and a subcontractor on the HEPFF Project, blaming them for MES's failed negotiations with the COE and the resulting default termination (Ex. 122 to Def. Mem.). While Plaintiffs' counsel sought, during oral argument, to mitigate the impact of these emails by shortening the period of alleged representation to January 2009 and limiting the role of MES's counsel to matters separate from those handled by WTH&F, as discussed *infra*, there exist numerous emails within this shortened time frame that directly contradict Plaintiffs' purported belief about having an attorney-client relationship with WTH&F during that period.

[13] For example, (1) on 3/10/08 Safeco requested that Plaintiffs and their counsel, Timothy Sullivan, meet with Safeco prior to Safeco's meeting with the COE on the Pyro Project bond demand (Ex. 33 to Def. Mem.); (2) on 4/14/08, Safeco sent an e-mail to arrange a meeting with Plaintiffs and their counsel, Sullivan, to discuss WTH&F's negotiations on Safeco's behalf with the COE regarding the surety takeover agreement on the Pyro Project (Ex. 51 to Def. Mem.); (3) on 4/16/08, Safeco sent another email to Plaintiffs requesting that Plaintiffs forward an enclosed letter to their attorney (Ex. 52 to Def. Mem.); (4) on 11/18/08 and 11/28/08, Plaintiffs sent two letters to the COE requesting that the COE cure the alleged deficiencies on the ERDLF Project, copying Sullivan on both letters (Exs. 46–47 to Def. Mem.); (5) on 12/15/08, Safeco emailed Plaintiffs in regard to a meeting between the two parties, stating that "given the 'global' nature of the discussion as described by you, and given the fact that Safeco will also be presented by Chris Brasco, I again suggest that you have counsel present at the meeting[,]" to which Plaintiffs responded, "MES will not have counsel present and recommended that Safeco does the same, but do not object for Safeco to have its attorney present." (Ex. 116 to Def. Mem.); and (6) on 2/19/09, an email from Safeco to Plaintiffs stated that, "Vivian Katsantonis and Chris Anzidei of Watt Tieder (they are partners with Chris Brasco) can meet with you . . . .Safeco suggests that M.E.S. have its legal counsel present at our meeting and in any subsequent dealings with the DOL [Department of Labor]", to which Plaintiffs replied, "As to meeting with Safeco's counsel . . . MES has never had its attorneys present or involved, and wanted to deal with Safeco and Safeco only, but as a courtesy did not object for Safeco having its attorneys present. MES is not interested in meeting with Safeco's attorneys. . . ." (Ex. 120 to Def. Mem.).

repeatedly, verbally at meeting [sic] as well as in writing, informed [Safeco] and its consultants (whether they are attorneys or not) that MES has not appointed any counsel to represent its interests when it comes to its dealings with [Safeco]."[14] (Ex. 126 to Def. Mem.) (emphasis added). In addition, evidence that Safeco and Plaintiffs maintained an adversarial relationship throughout this time period undermines Plaintiffs' claim that they had a belief, no less a reasonable one, that they were represented by WTH&F based on their joint interests with Safeco.[15]

---

[14] Other evidence indicating Plaintiffs' knowledge that WTH&F represented Safeco and not MES includes the following: (1) on 6/17/08, Plaintiffs emailed Safeco regarding a proposed Subcontract Agreement, stating "I have not sent this proposed subcontract to Tim Sullivan [Plaintiffs' counsel] for his review yet. . . ." (Ex. 39 to Def. Mem.); (2) on 7/1/08 and 7/15/08, Plaintiffs requested that Safeco forward him copies of all invoices that "Safeco received from your consultants and attorneys," and copies of "Safeco's expenses and its consultants and attorney's invoices." (Exs. 23, 53 to Def. Mem.); (3) Plaintiffs sent a letter to the COE on 10/22/08, stating that "[w]e understand from the Surety [Safeco] that their attorney has prepared the Memorandum of Understanding agreed to at our 16 September 2008 meeting. . . ." (Ex. 87 to Def. Mem.); and (4) on 1/8/09, Plaintiffs requested Safeco's permission to contact Safeco's counsel "Christopher Brasco [WTH&F] for the expert witness recommendations for Pyrotechnics. . . ." (Ex. 118 to Def. Mem.).

[15] For example, (1) on 4/14/08, Plaintiffs emailed only Safeco its comments on the surety takeover agreement, stating that "MES does not concur with Safeco's decision to take over the completion of the project," and claimed that "it endangers other MES projects with the COE, and impairs MES'[s] ability to negotiate and conduct its business without undue hardship." (Ex. 65 to Def. Mem.); (2) on 7/18/08, Plaintiffs sent a letter to Safeco, accusing it of "irresponsible excessive spending" and that "MES is unable to accept Safeco's latest demands," and "despite the objections of MES, Safeco agreed to take over the completion of the project" and "Safeco also improperly ceded to the demands of the Government to exclude principal, MES, from any and all discussions, negotiations, resolution of disputed issues, etc., exposing both MES and Safeco to needless losses and additional risks. . . ." (Ex. 75 to Def. Mem.); (3) on 8/4/08, Plaintiffs sent a letter to Safeco, accusing Safeco of "breaching and defaulting on its obligations under the qualified [General Agreement of Indeminty "(GAI")] when it decided to takeover [sic] the completion of the project." Plaintiffs argued that "Safeco did not act in good faith" but acted in "bad faith" and "with intent to defraud MES." In this letter, Plaintiffs copied their attorney, Mark Zawisny, on the letter (Ex. 77 to Def. Mem.); (4) on 8/28/08, MES emailed Safeco, stating, "Safeco is not authorized to discuss any matter concerning the HEPFF project with anyone without the presence or written permission of MES since we do not want Safeco to undermine MES'[s] rights or jeopardize MES'[s] position against Owner or any Subcontractor or others as

At oral argument, Plaintiffs attempted to salvage their claim about the existence of an attorney-client relationship by: (1) redefining and shortening the period of representation to conclude in January 2009 rather than April 2009 (as alleged in the complaint); and (2) arguing that Plaintiffs had "drawn a line" between the lawyers they used solely for their dealings with Safeco, *e.g.*, Sullivan, Payne and Zawisny, and WTH&F, whom Plaintiffs allegedly retained for the negotiations alongside Safeco with the COE. However, even this belated reconstruction is belied by the previously discussed evidence. The sixth factor thus weighs decidedly against finding an attorney-client relationship between Plaintiffs and WTH&F.

Based on its weighing of the relevant factors, the Court finds that Plaintiffs have failed to adduce sufficient evidence demonstrating the existence of a genuine dispute of material fact regarding the existence of an attorney-client relationship between Plaintiffs and WTH&F. Accordingly, summary judgment is granted in Defendants' favor on Plaintiffs' legal malpractice claim.

### III. Fiduciary Claims

Plaintiffs argue that even if its relationship with Defendants did not rise to the level of an attorney-client relationship, Defendants still breached its fiduciary duty and duty of care to Plaintiffs as non-clients in pursuing Safeco's business. (Compl. ¶ 184.) Plaintiffs state that Defendants were "at all times bound to exercise the utmost good faith and standard of care in

---

Safeco has done in the past." (Ex. 82 to Def. Mem.); and (5) on 11/25/08, Plaintiffs sent Safeco an adversarial letter regarding the ERDLF Project, stating, "MES is directing Safeco not to attend the scheduled December 3, 2008 meeting between MES and the COE, since Safeco's attendance will only diminish MES'[s] bargaining position and provide the COE with unfair and harmful leverage against MES. MES has informed Safeco time and time again of its disapproval of the positions and actions that Safeco has taken on the Pyrotechnics and HEPFF Projects." (Ex. 111 to Def. Mem.). Notably, *all* of these communications are within the shortened time frame of alleged representation relied upon by Plaintiff at oral argument.

providing legal advice to a non-client in the course of interacting with [Plaintiff] in pursuing Safeco's business." (*Id.* ¶ 178.)

"A fiduciary duty arises under New York law wherever 'one person is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation.'" *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 351 F. Supp. 2d 79, 201 (S.D.N.Y. Aug. 10, 2004) (quoting *Flickinger v. Harold Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991)). In order to establish a cause of action for breach of a fiduciary duty with respect to the execution of the agreement, the plaintiff must establish: (1) the existence of a fiduciary relationship; (2) misconduct by the defendant; and (3) damages that were directly caused by the defendant's misconduct. *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011).

Under New York law, where a claim for breach of fiduciary duty is "'premised on the same facts and seeking the identical relief' as a claim for legal malpractice, the claim for fiduciary duty 'is redundant and should be dismissed.'" *Nordwind v. Rowland*, 584 F.3d 420, 432-33 (2d Cir. 2009) (quoting *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 780 N.Y.S.2d 593, 596 (1st Dep't 2004)); *Joyce v. Thompson Wigdor & Gilly, LLP*, No. 06 Civ. 15315, 2008 WL 2329227 (S.D.N.Y. June 3, 2008) ("Under New York law, where claims of negligence, breach of contract, breach of fiduciary duty, negligent misrepresentation, or fraudulent misrepresentation are premised on the same facts and seek identical relief as a claim for legal malpractice, those claims are duplicative and must be dismissed."); *Schweizer v. Mulvehill*, 93 F. Supp. 2d 376, 400 & n. 29 (S.D.N.Y. Mar. 31, 2000) ("New York law clearly provides . . . that where breach-of-fiduciary duty claims mirror allegations of malpractice, they must be dismissed.").

Here, Plaintiffs' fiduciary duty and legal malpractice claims are plainly redundant. Plaintiffs have premised both claims on the same legal advice and representation allegedly provided by WTH&F. Plaintiffs have identified no other factual basis for these claims, nor do they allege any distinct damages arising from these claims.[16] Though Plaintiffs would like to argue, in the alternative, that WTH&F's advice breached a duty to Plaintiffs, either as clients or non-clients, this strategy is precisely what the case law forbids. Therefore, Plaintiffs' breach of fiduciary duty and duty of care claims must be dismissed.[17]

## IV. Tortious Interference Claim

The elements of a claim of tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the third party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages. *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 207 (S.D.N.Y. June 12, 2008) (citation omitted).

Plaintiffs fail to present sufficient evidence to make out a claim for tortious interference. Plaintiffs have provided no evidence of WTH&F's alleged intentional, improper and unjustified interference with the federal contracts at issue. Plaintiffs' bare allegations that WTH&F colluded

---

[16] Plaintiffs argue that their fiduciary duty, tortious interference and unjust enrichment claims are not ripe for summary judgment because discovery in this case has been limited to the issue of whether there existed an attorney-client relationship. (Dkt. 46.) However, no additional discovery is necessary with respect to Plaintiffs' fiduciary duty and unjust enrichment claims, both of which are being dismissed as legally defective. With respect to Plaintiff's tortious interference claim, as discussed *infra*, Plaintiffs have failed to demonstrate that there is any additional discovery that would save this claim from summary dismissal.

[17] Even if these claims are not considered duplicative, the fiduciary duty claim would nonetheless be dismissed because of the clear evidence establishing that Plaintiffs had an adversarial relationship with Safeco and WTH&F, Plaintiffs' interactions with WTH&F were in furtherance of duties that Plaintiffs owed Safeco under the indemnity agreement, and Plaintiffs were advised to use their own legal counsel.

with the COE against Plaintiffs and tortiously interfered with Plaintiffs' COE contracts in order to advance Safeco's agenda are not supported by any evidence. Safeco had a legal duty to communicate with the COE regarding the COE's default terminations of MES and the bond demands made by COE upon Safeco, and there is no evidence that WTH&F exhibited any improper behavior when acting in furtherance of Safeco's contractual responsibilities under the performance bonds. Furthermore, Plaintiffs offer nothing to explain what possible motive Safeco would have to collude with the COE to cause Safeco to expend millions of dollars to make good on MES's contracts with the COE after MES defaulted.

Plaintiffs argue that the tortious interference claim should not be dismissed because discovery thus far has been limited to the issue of whether an attorney-client relationship existed between Plaintiffs and WTH&F, and that Plaintiffs' tortious interference claim, therefore, is not ripe for decision. However, Plaintiffs have failed to identify any additional discovery that they would conduct regarding this claim. (Pl. Opp. at 21–22.) Indeed, the discovery on the attorney-client relationship issue provided ample opportunity for Plaintiffs to develop at least some evidence to support its claim of collusion between WTH&F, Safeco and the COE with respect to the three MES/HMES contracts. And yet Plaintiffs offer none. Moreover, the complaint fails to identify any factual allegations that support Plaintiffs' claims of collusion and tortious interference that could be pursued in discovery. (Compl. ¶¶ 193, 196). Plaintiffs' failure to raise even a scintilla of evidence in support of this claim, based on the extensive discovery already conducted in this case, demonstrates the futility of permitting Plaintiffs to continue this lawsuit solely for the purpose of conducting a fishing expedition in pursuit of a meritless claim.

Summary judgment on Plaintiffs' claim for tortious interference is granted in favor of Defendants.

## V. Unjust Enrichment Claim

Plaintiffs claim that WTH&F was unjustly enriched because it received payments from MES and Safeco for legal fees. (Compl. ¶ 211.)

Under New York law, a plaintiff may prevail on a claim for unjust enrichment by demonstrating "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (citing *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). WTH&F did not receive payment, in any form, for its legal services from Plaintiffs, and thus, WTH&F was not unjustly enriched at Plaintiffs' expense. (Brasco Aff.[18] ¶¶ 5, 16; Katsantonis Aff.[19] ¶¶ 5, 7.) WTH&F was paid by its client, Safeco, for services performed by WTH&F for Safeco. Safeco's payment of legal fees to its attorney, WTH&F, does not constitute unjust enrichment. Safeco's right to recover these fees from Plaintiffs is based upon a separate indemnity agreement executed as part of Safeco's surety relationship with Plaintiffs,[20] and does not form the basis for an unjust enrichment claim against WTH&F. Accordingly, summary judgment is granted for Defendants on Plaintiffs' unjust enrichment claims.

---

[18] Citations to "Brasco Aff." refer to Affidavit of Defendant Christopher Brasco in Support of Defendants' Motion for Summary Judgment. (Dkt. 105.)

[19] Citations to "Katsantonis Aff." refer to the Affidavit of Defendant Vivian Katsantonis in Support of Defendants' Motion for Summary Judgment. (Dkt. 105–2.)

[20] To the extent Plaintiffs believe that they are entitled to be compensated for having paid Safeco's legal fees, that issue can be raised as part of Plaintiffs' defense in the indemnification lawsuit brought by Safeco against Plaintiffs, 09 Civ. 03312, or as part of Plaintiffs' lawsuit against Safeco alleging Safeco's bad faith breach of the Indemnity Agreement, 10 Civ. 02798. The instant lawsuit, however, is not the proper vehicle for such a claim.

*CONCLUSION*

For the reasons discussed herein, Defendants' motion for summary judgment is granted in its entirety.[21] The Clerk of the Court is respectfully directed to close this case.

SO ORDERED:

  /s Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: September 2, 2015
       Brooklyn, New York

---

[21] In light of the Court's ruling granting Defendants' motion for summary judgment, Plaintiffs' belated request to amend the caption of the pleadings (Dkt. 120) is denied as moot.